## LAURA MISKOWIAK *v.* BETHLEHEM STEEL COMPANY.

[No. 7. January Term, 1929.]

*Decided March 19th, 1929.*

The cause was argued before BOND, C. J., URNER, DIGGES, PARKE, and SLOAN, JJ.

*J. Calvin Carney* and *Marion A. Figinski,* with whom was *Abram C. Joseph* on the brief, for the appellant.

*George Weems Williams* and *Boyd B. Graham,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The widow of Michael Mishowiak, a dead employee of the Bethlehem Steel Company, the employer and self-insurer, having her claim for compensation first rejected by the State Industrial Accident Commission, and then by the Baltimore City Court on an appeal, has brought to this court the question whether there is legally sufficient evidence on the record that the employee's death was the result of an accidental injury which arose out of and in the course of his employment. This was the issue before the commission, whose finding in favor of the employer is presumptively correct. Code, art. 101, sec. 56. The testimony on the record that supports the claimant's right to compensation must, therefore, be accepted as true and accorded its full weight, but without its probative value being enhanced by any statutory presumption in favor of the claimant's right to a recovery.

The employee, Michael Miskowiak, was forty-three years old at the time of his injury on April 21st, 1927. He was a tall, strong and healthy man, and he had been employed for six years by the Bethlehem Steel Company. His work was in a large brick building, about 150 feet wide and 1,200 feet long, in which there were 20 furnaces. The building is of one story, from 50 to 60 feet in height, and is well ventilated and lighted. The furnace at which Miskowiak worked was about 20 feet long and 6½ feet wide, with doors at the front and back. The side walls are about 16 inches thick and the front and rear walls are about 12 inches, and the furnace is so built and constructed that there is but little heat radiation, except from the doors or through them when opened. The furnace is automatically fed the soft coal it burns, and is, also, mechanically fired by a stoker; and the interior of the furnace is maintained at a temperature of 1500 degrees, but the furnace is equipped with a mechanical contrivance designed to carry most of the heat up the stack when the door is opened. The furnace was operated by a crew of twelve men, which worked in periods or shifts of 15 or 20 minutes, so

that, in every hour of a day, beginning at 7 o'clock in the morning and ending at 3 in the afternoon, the members of the crew would work 30 minutes, because of the heat and of the arduous nature of their labor. While at work the men wore a sweat shirt, a pair of overalls, and a pair of mill shoes, with soles of a combination of rubber and canvas so that they would not burn from the floor.

The furnace is charged through the back door by machinery which stands bars of steel on end in the furnace, where they remain until heated to 1400 degrees, when they are ready to be rolled into steel sheets, and are then removed through the front door of the furnace. This process is continuous, since as bars are discharged through the front door they are immediately replaced by the introduction of a like number through the back door, in order that the furnace be always filled to its capacity. The bottom of the front door is 29 inches from the cast iron floor, which extends in front of the furnaces. Miskowiak's job was to take these red hot bars out of the furnace. He wore gloves and had a pair of tongs 36 inches in length. The front door was in three sections, and Miskowiak first opened one of these sections about two feet and then with his tongs pulled down seven or eight bars at a time; drew out and picked up a pair of the bars with his tongs and dragged them on the floor for about 30 feet to where the next workman stood, who helped Miskowiak lift the pair of bars about 10 inches to the fore plate, from which they passed through the process of being rolled and converted into steel sheets. As soon as Miskowiak had been helped to deliver the two bars on the fore plate, he returned to the furnace for another pair, and repeated the operation until he had pulled and delivered fifteen pairs of bars in his shift. Apparently the weight of the bars varied with the nature of the order, and, on the day of his attack, Miskowiak was working on what was known as a heavy, though ordinary, order, and the bars weighed 49 pounds. One witness estimated the weight of the bars at 59 pounds, but this is evidently a mistake, as all the other witnesses agree they did not weigh more

than forty-nine pounds and the brief of the widow accepts this weight as correct. The difference, however, is not material, since, no matter the weight of the bars, there is no evidence that the work being done was not in the course of the customary labor of the workman.

The testimony tends to show that April 21st was a warm day for that time of the year. One of the witnesses for the widow described it as a sticky, sultry day, like one in summer, and said that he had to go out to get air, as was usual with him on every hot day. He further stated that rain was threatened, and that on a rainy day the air in the mill was heavier or denser on account of the smoke and heat, and that he observed in the mill more gas from the coal burned in the furnaces on April 21st than any other day because of the weather. The record kept in Baltimore by the United States Weather Bureau showed that the temperature from 8 o'clock in the morning to noon ranged from 66 degrees to 72 degrees, and from noon to 3 o'clock in the afternoon the temperature rose from 72 degrees to 77 degrees. The average temperature for the day was 14 degrees above normal and the humidity was about 13 degrees above normal in the morning and 16 degrees at noon. What it was from noon to 3 o'clock is not given. Miskowiak worked all day under these conditions without any apparent distress or making any complaint; and, after his day's work was done, he left the furnace and walked to a skid iron about five or six feet from the back of the furnace, where he sat down, and then rolled over without an outcry. One of the men went to him, and asked him what was wrong with him, and Miskowiak replied "Oh, my side," and grabbed his left side, but the witness could not say whether it was under or about the heart.

Miskowiak got up and walked away, saying to one of the workmen that "he was feeling bad on his stomach" and was going to the dispensary. When he reported there he was found to be suffering with heat exhaustion and cramps in the stomach, for which he was treated; but, growing worse, he was sent to the hospital, where he arrived near midnight in

694

an unconscious state, and died about two hours later of exhaustion produced by shock. The physician who examined the patient at the hospital testified that his condition when received rendered it impossible to make a diagnosis, but his symptoms were found as in cases of heat prostration. The physician who prescribed for Miskowiak at the company's dispensary testified that the patient was suffering with heat prostration or exhaustion. Another physician, who had not seen the patient, but who had heard all of the testimony relative to the employee's condition, except that of the doctor at the dispensary, expressed the opinion that death was due to a heat stroke. The weight of this opinion is much impaired by the fact that the latter witness was testifying without any information of the workman's temperature, respiration and pulse in the first period following the attack, since the only one who gave this testimony was the doctor at the dispensary, and the medical evidence on the record is that in heat stroke the temperature of the victim is very high, while in case of heat exhaustion or prostration the temperature is usually subnormal and only occasionally a trifle above normal. Another distinction to be observed is that in heat exhaustion or prostration the person affected becomes weakened and feels the early symptoms, which progress gradually until a collapse ensues, but a heat stroke generally comes suddenly and the person affected collapses and becomes unconscious. The testimony having probative value makes it probable that the workman died of heat prostration. However, the evidence is that both heat stroke and heat prostration or exhaustion are caused by an excessively high temperature of the human body and its retention of the heat, primarily through a failure to perspire. The exhaustion may be the result of exposure to excessive heat. Humidity of the atmosphere is a predisposing cause, and, as is well known, so are bodily fatigue, intemperance in eating or drinking and physical uncleanliness.

Although it was not so warm by seven degrees as the preceding day, April 21st was warm for that time of the year. Heat and the humidity were the only circumstances

upon which the widow could rely to make her claim compensable, as there is nothing in the record to show that the workman was affected by the gas escaping from the burning coal in the furnaces. The employee had been engaged in the routine performance of his daily labor, and had completed his day's work without receiving any injury by impact or contact, or as the result of an unusual muscular exertion or unexpected movement. There is no question, however, that he died of heat stroke or prostration, but, before his injury may be held compensable, there must be legally sufficient evidence that the workman, in the language of Judge Offutt, speaking for the court in *Slacum v. Jolley,* 153 Md. 351, 353, "died of heat stroke or heat prostration, and that such injury was occasioned by some unusual and extraordinary condition in his employment, not naturally and ordinarily incident thereto."

A careful scrutiny and weighing of the evidence, and the inferences naturally and properly deducible therefrom, show that the conditions specified by this court do not exist in the appeal at bar. The workman had been employed in the mill for six years, and the nature of his work uniformly called for strenuous muscular exertion in the artificial heat generated throughout the year by the furnaces and by the radiation from the red-hot steel which was being rolled into sheets. The inside temperature of the mill, which was ventilated, would be affected somewhat by either cold or hot weather, and the effect of either heat or cold upon persons is increased when they are exposed to the humidity of the atmosphere. These variations of temperature within the mill were incidental to the prevailing weather conditions, which, in our climate, are subject to frequent and decided changes throughout all the seasons of the year. Such climatic changes are universal within the region affected; and, therefore, fluctuations of temperature and humidity are a normal condition to be encountered and borne by the workmen in the course of any periodic employment. So, unless the change in the weather created an unusual and extraordinary condition in the workman's employment, an injury

from heat stroke or prostration is not compensable. *Supra.* There is no proof of the degree of heat in which the workman labored within the mill on the day he was prostrated, nor at any other time, so the actual effect of the rise in the temperature outside of the mill upon that within the mill is unknown. Nor is there any evidence from which it can be inferred that the rise of the temperature outside had a corresponding increase in degrees of heat within the mill. Nor can it be said that an increase on a humid day of outside temperature from 66 degrees at 8 A. M. to 77 degrees at 3 P. M., although 14 degrees above normal for an April day, produced within the mill any "unusual and extraordinary condition" in the workman's employment, since the sole effect of the atmospheric heat and humidity was, at most, but to create conditions within the mill that were comparable to those of a humid, summer work day. To have such a day in so variable a month as April is neither unusual nor extraordinary, and the testimony does not show that its effect within the mill was to cause either unusual or extraordinary working conditions to prevail. Consequently, the injury received by Miskowiak was not compensable under the rule announced in *Slacum v. Jolley*, 153 Md. 343, where it was said:

"The appellant contends that 'heat prostration' is not compensable under the Workmen's Compensation Law of Maryland, because it is not an accidental injury, but in our opinion that contention goes too far. Subsection 6, section 65, article 101, of the Code, provides that 'injury' and 'personal injury' mean only accidental injuries arising out of and in the course of employment, and such disease or infection as may naturally and unavoidably result therefrom. And if heat stroke or heat prostration are caused by unusual and extraordinary conditions in the employment, which cannot be regarded as naturally and ordinarily incident thereto, there is no apparent reason why such injuries should not be compensable. * * *

"But to entitle the claimant to compensation it was essential that there be at least some evidence that her husband.

died of heat stroke or heat prostration, and that such injury was occasioned by some unusual and extraordinary condition in his employment not naturally and ordinarily incident thereto, and there is no such evidence in this case."

So, if heat stroke and heat prostration or exhaustion are to pass from the category of disease to that of compensable accidental injury, they must occur as a result of these prescribed conditions, which, as has been stated, have not been established on this record by sufficient proof. It follows that there is no reversible error in the trial court's instructions, and its judgment will be affirmed.

*Judgment affirmed, with costs, and cause remanded.*