STATE ROADS COMMISSION et al. *v.*
HENRIETTA C. REYNOLDS.
[No. 45, January Term, 1933.]

540

*Decided April 6th, 1933.*

The cause was submitted on briefs to BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William Preston Lane, Jr., Attorney General, Willis R. Jones, Deputy Attorney General,* and *Harry J. Green, Special Attorney for the State Accident Fund,* for the appellants.

*Isaac Lobe Straus,* and *Avrum K. Rifman,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

John C. Reynolds, an employee of the State Roads Commission, become ill while engaged in the performance of his duties and was taken from the place where he was at work to his home at Rockland, in Baltimore County, in his employer's truck. The chauffeur left him on the seat of the truck, which had stopped in front of his house, and went in for help. When he returned, he found Mr. Reynolds had fallen from his position, and was dead. Dr. E. E. Nichols was summoned, and, as a result of his examination and the history of the case which he then received, certified that death had been caused by angina pectoris.

The death occurred on July 8th, 1930, and on July 26th, 1930, Mrs. Henrietta Reynolds, the widow, filed with the State Industrial Accident Commission a claim for compensation on the ground that her husband's death was the result of an accidental injury arising out of and in the course of his employment. The case was contested, and at the conclusion of the hearing the commission found for the claimant and awarded compensation at the rate of $12.47 per week for the period of 401 weeks, not to exceed $5,000. From that award the employer and insurer appealed to the Baltimore City Court, where the case was heard by the court sitting as a jury. The verdict and judgment of that court were also for the claimant, and from that judgment this appeal was taken. The single question it presents, raised by

the refusal of appellants' demurrer prayers, is whether there was legally sufficient evidence in the case to show that Reynolds' death was caused by an accidental injury arising out of and in the course of his employment. At the time of his death Mr. Reynolds was seventy-four years of age. He was employed, ordinarily by the hour as a road patrolman, by the state roads commission, and was assigned to Bellona Avenue between Rockland, where he lived, and Charles Street, in Baltimore County. He was about five feet five inches in height, and in bodily habit somewhat robust. His usual duties were light and desultory in character, trimming the roadside grass, patching small holes, cleaning drain pipes, keeping dirt from the shoulders, and clearing away limbs, trash, or other debris that may have fallen on the roadway. In connection with them he used an ordinary broom, a fork, a shovel, a pick and mattock combined, and a wheelbarrow.

On the day of his death he was taken from his regular work and ordered to assist in loading cobble stones weighing from about fifteen to thirty pounds into a truck, the top of which was about four and a half to five and a half feet from the ground. The day was very hot, and his work directly exposed him to the sun, which was shining brightly. The truck was being loaded on the York Road, and his work consisted of picking up the cobble stones which had been loosened with a pick from the sand in which they were embedded and throwing them in the truck. He was taken from his work on Bellona Avenue to the truck by the inspector in charge of the work, and when he arrived there the truck had been more than half loaded. He completed the loading, went with the truck to Charles Street, where the load was dumped, returned, and there is testimony that he then threw in part of another load, although there is other testimony to the contrary. But either at the time he returned from Charles Street, or while engaged in throwing the second load on the truck, he complained of feeling badly, said that he had a pain "in his chest," and that he had indigestion. J. W. Cooley, who drove the truck, advised him to stop work, and asked if he wanted a physician. He said that he did not, that he wanted to go

home. He then climbed or was assisted to the seat of the truck, where he was supported by Cooley. Cooley drove the truck to Charles Street, dumped the load there, and then drove to Reynolds' home at Rockland.

When he arrived there, Cooley testified: "I was about played out holding him up so he would not fall out the truck, and when I got home I stopped in front of his house and ran in for help. Q. At that time was he living? A. I would not say for sure, I guess he was about ready to die. Q. Did you tell me he was living at the time you left the truck? A. I set him up in position. Q. Did he maintain that position? A. No, I came out of the house with Mr. Reynolds' son-in-law, he came out and as soon as he grabbed him he kind of fell and he must have struck his head, he fell down between the cab and the body of the machine and the window was out and he must have struck his head right here on his ear."

The same witness further said: "Did you have any conversation with him on the way home? A. Yes, he talked to me until he got past Ruxton bridge and that is the last thing he said. He said he was sick and he could not sit alone. I held him there from the time I dumped the stone over to his house. Q. Up until the time you dumped the stone had he been conscious? A. Yes, he had been conscious. Q. You say he must have fallen over when you left him in the truck at his home? A. That's right. Q. How far did he fall? A. I judge about two feet from his head to the side, maybe three. Q. When you came out you don't know whether he was dead or not? A. He was dead when we picked him up."

Dr. E. E. Nichols, who examined him, and certified the cause of death as angina pectoris, testified that in his opinion when Reynolds fell over he was dead, and that the fall had no connection with his death. But he said that in view of the facts brought out at the hearing he had changed his original opinion that death was due to angina pectoris. In connection with that conclusion he said:

"When I reached there Mr. Reynolds was dead; they had taken him in the house and I looked him over and listened

544

to his heart; he was dead. I asked a few questions and the family told me that he had complained of pain in his chest and had died, and my impression at that time was the man died in a few minutes and had been brought home dead, but the subsequent history of this thing has been brought out here; he was taken sick with pain in his chest and he evidently lived an hour before he came home. And another point in the history of the thing that I did not get at the time was the fact that Mr. Reynolds was a man accustomed to do light work and I passed through there time and again, every other day or so, and have seen him on the road picking up paper and digging out grass, and on this day I understand he had been taken off the light work and put on heavy work. The day was extremely hot, I don't know just what it was but it was around the hundred mark, but I believe the cause of the man's death, if you want me to state that, considering the fact he was stricken and lived an hour, more or less, that he had been doing heavier work than he was used to, he does not do that kind of work, and in view of that, plus the heat of the sun, near the hundred mark, I believe that the cause of his death was the extreme heat that day.

"Q. That would be called, in medical terms, heat prostration? A. Heat prostration or heat stroke will kill them quicker than prostration but I did not see his general countenance of features when I saw him at the time he was dead, and of course the features were entirely different from seeing him when he was alive. * * * You testified that a man who suffered from heat stroke or heat prostration, normally the older he is the less resistance he has to withstand that. In that condition would a shock from a fall precipitate or induce or accelerate his death? A. Certainly, a fall like that would accelerate or hasten it a great deal in that length of time that it took this fellow to run in the house and out again. "Q. (By Commissioner Crothers): Would heat stroke cause the man to fall over without dying—you said you thought he was dead when he fell over, he would not have to be dead to fall over? A. No, he could get a stroke from the heat and

render him unconscious and lay him flat. Q. And he would still live after that? A. Yes, for a time at least. Q. Would this blow on his head accelerate his death if he was living at the time? A. The condition he was in, yes, if he got a blow on the head it could have helped it or hastened it. * * * Q. On the death certificate you gave the cause of death as what? A. Angina pectoris. Q. In the light of the history have you changed your mind? A. Yes, I have, because the duration is a few minutes, my understanding at the time was he only lived a few minutes. I did not get the understanding he was brought home alive, my understanding was he died a few minutes and was brought home and that plus the history of pain in his chest would indicate he died from angina pectoris, but at the time I did not get a history of the other things, I did not hear anything about the fall. And another thing, on this hot day this man was doing this extra heavy work, work that I know he did not. * * * Q. Doctor, you are passing your opinion on the heat or heat plus the character of work the man was doing? A. That's what I say—the man would get his blood hotter by the work he was doing that day than he ordinarily would because his work was lighter."

Doctor Nichols, who had been his family physician for twelve or fifteen years, further testified that he had never treated Reynolds for angina pectoris nor for indigestion, and he also said that while a man seventy-four years old was "liable to have heat prostration on any hot day he undertakes to do laboring work," he added that if he undertook "unusual work" it would increase the probability.

That evidence was sufficient to justify the conclusion that Reynolds died as the result of heat prostration or sun stroke resulting from the work at which he was engaged under the extreme heat conditions, and the controlling question in the case is whether that was an accidental injury arising out of and in the course of his employment.

There is no question that the injury occurred in the course of his employment, for it originated while he was actually at work, and at least the weight of authority supports the view

that such an injury may under some circumstances be regarded as accidental within the meaning of that word as used in the statute. *Slacum v. Jolley,* 153 Md. 351, 138 A. 244. *Schneider on Workmen's Compensation,* secs. 249, 338, 28 R. C. L. "Workmen's Compensation," secs. 87, 94; 13 *A. L. R.* 979 note, Words and Phrases, First, Second, Third and Fourth Series; *L. R. A.* 1918F, 936 note. "Accidental," so used, may mean any fortuitous, casual, and unexpected happening which causes personal disability or death which results from some unknown cause, or from the unexpected and unusual operation of a known cause; and an accident may be said to arise "out of an employment" when it results from conditions and circumstances reasonably incident to it. Authorities cited, *supra;* 16 *A. L. R.* 1038; 40 *A. L. R.* 402; 46 *A. L. R.* 1218; 53 *A. L. R.* 1085, notes. A heat stroke or heat prostration may be an accident within that definition, where it actually results from the employment, and at the time it is suffered the person afflicted is by the nature of the employment subjected to a greater risk than the public generally. *Ibid.* The cases cited as supporting a contrary view (*Slacum v. Jolley, supra; Miskowiak v. Bethlehem Steel Co.,* 156 Md. 690, 145 A. 199, and *Atlantic Coast Shipping Co. v. Stasiak,* 158 Md. 349, 148 A. 452) upon examination are found to be entirely consistent with what we have stated. They did not decide that a heat stroke or heat prostration was not an accident, or that it could not arise out of the employment, but they did decide that, before it could be regarded as an accidental injury compensable under the act, it must appear that it was "caused by unusual and extraordinary conditions in the employment, which cannot be regarded as naturally and ordinarily incident thereto."

It may fairly be inferred from the evidence that Reynolds died as a result of heat prostration or a sunstroke which would not have occurred but for the heat of the day and the character of the work in which he was engaged. The heat of the day was a fixed condition, in the sense that it was neither higher nor lower, but the same for the whole public subjected to it, and was a constant factor. Its effect on individuals de-

pended upon varying conditions, such as the power of resistance, and the exposure of the individual and the nature of his work, and was a variable factor. If the injury resulted from the heat of the day alone, then it did not arise out of the occupation and was not compensable, because then it arose from a cause which affected all alike, and not from the employment. But if it arose from the heat plus the nature of the employment and the conditions under which it was performed, then it arose from conditions which did not affect those engaged in the occupation and those not so engaged alike, and may fairly be said to have arisen out of the employment.

If the evidence supporting the claim is taken as true, as for the purposes of this case it must be, it may reasonably be inferred that, if Reynolds had been engaged in an occupation no more laborious than that of the ordinary work of a road patrolman, the injury would not have occurred. Or stated in another way, it could have been inferred that it was due to three concurring causes, the heat to which he was exposed, the heavy physical labor in which he was employed, and his own low power of resistance. The first was public and general, the latter two in varying degrees peculiar to him, so that when the three concurred to produce the injury it cannot be said to have arisen from a cause common to the public generally, for the public generally were not subjected to the hazards incident to the work. It may well have been that a younger and stronger person could have done the same work under the same conditions without injury, but that does not affect the question, if the doing of it, because of its nature, did in fact accidentally injure him. For the test of the compensability of injury said to have arisen out of the employment is not whether the employee is weak or strong, but whether the disability was proximately caused by some unusual and extraordinary condition in his employment not usually and naturally incident thereto. *Baltimore Dry Docks Co. v. Webster,* 139 Md. 616, 116 A. 842; *Standard Gas Equip. Corp. v. Baldwin,* 152 Md. 321, 136 A. 644; *Kauffman Constr. Co. v. Griffith,* 154 Md. 55, 139 A. 548; *Slacum*

*v. Jolley, supra; Miskowiak v. Bethlehem Steel Co., supra; Atlantic Coast Shipping Co. v. Stasiak, supra.*

Applying that rule to the facts of this case, it might be asked, "What was there unusual or extraordinary in loading cobble stones into a truck employed in road repair under the blazing sun of a hot summer day? Are not such conditions usual, ordinary and to be expected in such work." The answer to such a question is that, although such conditions might be usual and ordinary in the case of one employed to load trucks, they were unusual and extraordinary in Reynolds' employment. He was employed primarily as a patrolman. Loading trucks was not his regular employment. There is no evidence that he had ever been called upon before to do such work, and his employment on that occasion was an "extra job." It may be inferred that he was qualified to do his regular work with no unusual strain or risk, but that he was not qualified to do the work of the "extra job" under the extreme weather conditions, and as to him that was an unusual and extraordinary incident of his employment; that while a relatively high temperature is seasonable, ordinary, and natural in the summer, the testimony is that the day of the accident was "a very hot day," "unseasonably warm, and very dry and hot," "very hot," "near the hundred mark"; that he was exposed to the direct rays of the sun; that he was picking heavy cobble stones from a bed of sand, lifting them possibly higher than his head and throwing them in a truck; and that he was working "pretty lively."

Those facts taken together are sufficient to permit the inference that, at the time of the injury, the conditions under which Reynolds was working were unusual, extraordinary, and not naturally and ordinarily incident to his employment as a road patrolman, and they, taken in connection with the presumption created by the statute (Code, art. 101, sec. 1 *et seq.*, as amended), are legally sufficient to support the award of the Industrial Accident Commission and the judgment of the Baltimore City Court. Cases cited, *supra; Fidelity & Casualty Co. v. Burris,* 61 App. D. C. 228, 59 Fed. (2nd) 1042.

Assuming the truth of Doctor Nichols' testimony, there can be no reasonable doubt that Reynolds' death was directly attributable to the work in which he was engaged, and that had he been subjected to no greater distress from the heat than the general public it would not have occurred. There can in the nature of things be no all-embracing definition of the phrase "arising out of and in the course of employment" other than that which the words themselves furnish, nor is it desirable that there should be, and it would not only be difficult but inconsistent with the statute itself to limit its meaning by inflexible formula or classification. So that its application to a given case must of necessity rest upon facts of that case and the plain ordinary meaning of "arise out of." If there is such a causal connection between the employment under the conditions affecting it and the injury that it may rationally be inferred that the employment caused the injury, then it may be said that it arose out of the employment. 28 R. C. L. 796.

The employer is not, under the act, a general insurer of the health of his employees, so that an accidental injury suffered in the course of the work is not compensable unless it arose out of the employment; but if there is legally sufficient evidence to support the conclusion that it did so arise, then the question as to whether it did in fact so arise is one of fact and not of law.

In view of that conclusion it becomes unnecessary to notice the contention that death ensued as a result of a fall, further than to say that the evidence in the case was not legally sufficient to show that at the time of the fall Reynolds was living or dead.

It follows that the demurrer prayers were properly refused, and the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*