HENRY HEIL ET AL. *v.* MORTANA M. LINCK
[No. 49, April Term, 1936.]

*Decided June 10th, 1936.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Albert A. Levin,* Special Attorney for State Accident Fund, with whom was *Herbert R. O'Conor, Attorney General,* on the brief, for the appellants.

*Maurice J. Pressman,* with whom was *Thomas Charles Williams* on the brief, for the appellee.

SHEHAN, J., delivered the opinion of the Court.

This case arises under the Workmen's Compensation Law (Code, art. 101, sec. 1 *et seq.,* as amended). Henry Heil, the employer of Henry John Linck, deceased, and the State Industrial Accident Fund, Insurer, are appellants. Mortana M. Linck, widow of the deceased, as claimant, recovered a judgment in the Court of Common Pleas of Baltimore City, reversing an order of the State Industrial Accident Commission. The only question to be considered in this appeal is, "Was the death of Henry John Linck the result of an accidental injury sustained by him on August 16th, 1935, arising out of and in the course of his employment?" On this issue the State Industrial Accident Commission decided in favor of the appellants. Upon appeal to the Court of Common Pleas there was verdict rendered in favor of Mortana M. Linck, the appellee, and from the judgment entered thereon this appeal was taken.

Henry Heil, the employer, was engaged in the wholesale and retail sale of meats, and for that purpose conducted several places of business in the City of Baltimore. One of the retail businesses was located in the North Avenue Market and another was on the Falls Road. Back of the Falls Road store there was a wholesale meat plant. Connected with these establishments were refrigerating rooms, and in them the employees performed such services as were incident to their employment. Henry John Linck, the deceased, who was fifty-six years

of age at the time of his death, had worked as a meat cutter for Henry Heil for five or six years, and for a greater part of the time he was employed at the Falls Road place of business, but at times he worked at the North Avenue Market. His employment at these places was similar. He habitually worked on Friday afternoons, and at other times, at the North Avenue Market in cutting quarters of beef in the cooling room. This work ordinarily required his presence in that room for about thirty minutes. As a part of his work, the deceased, with some assistance, carried these quarters of beef, weighing from 130 to 160 pounds, a short distance, and placed them upon a block for the purpose of cutting them into smaller pieces.

On Friday, August 16th, 1935, between the hours of three and four o'clock, p. m., the deceased had gone to the North Avenue plant, to cut quarters of beef, as was his habit. The temperature of the cold room was approximately 32 degrees. With Mr. Watts, another employee, the deceased was engaged in lifting from a hook a hind quarter of beef, weighing about 130 pounds, which both of them carried for the short distance of eight or ten feet to a meat block, where Mr. Linck cut it in small pieces. Shortly afterwards they lifted from a hook a fore quarter of beef weighing about 160 pounds, and both of them carried it the same distance to the block, and Mr. Linck cut that into about twenty pieces. The work was completed in approximately one-half an hour from the time he entered the cold room until he returned to the stall in the market. He smoked a cigarette, and engaged in conversation for about fifteen minutes, when he suddenly dropped dead. The widow testified that her husband enjoyed good health until about a week before he died, at which time he complained of a pain in the left side of his chest, and thought it was indigestion; that he never lost any time from work on account of sickness; that when he left home for work, on the morning of August 16th, 1935, "he appeared to be perfectly all right," said that he "felt fine," and during the course

of the day of his death he told Mr. Blucher, the manager, that he "felt fine."

The testimony is somewhat at variance as to just how hot the day was. The weather bureau showed the highest temperature was 89 degrees, and the lowest was 74 degrees, and at three p. m. it was 88 degrees, and at four p. m. 89 degrees. At noon the humidity was 59 per cent. The deceased claimed that he was very cold when he came out of the cold room, and had the appearance of suffering from it.

The testimony in this case, especially that of Mr. Blucher and Mr. Heil, establishes the fact that no separate employees were engaged for the wholesale plant, as distinguished from the retail plant, and that on Friday afternoons Mr. Linck, as a part of his regular duty, cut meat in the cool room of the wholesale plant, and for that purpose remained there for approximately a half hour; that incident to his regular duties he carried fore and hind quarters of beef, weighing from 130 to 160 pounds, for a distance of eight to fifteen feet; that the working conditions in the North Avenue plant and the Falls Road plant were about the same with regard to the cooling rooms; that this constituted a part of the regular employment of the deceased, in which he had been engaged for a long time. There is no evidence in the case that the deceased was doing other than being engaged in the routine performance of his labor, and the evidence clearly shows that he "had completed his day's work without receiving any injury by impact or contact or as the result of any unusual muscular exertion or unexpected movement." *Miskowiak v. Bethlehem Steel Co.,* 156 Md. 690, 145 A. 199, 201.

It is urged that this case falls within the ruling of *State Roads Commission v. Reynolds,* 164 Md. 539, 165 A. 475, but we think that the facts bring it within the case of *Miskowiak v. Bethlehem Steel Co., supra.* The appellant has drawn an instructive parallel between the latter case and the instant case. In both of them it seems that there was a very hot day, there was heavy lifting and

carrying, the working time was approximately a half hour in each case, the deceased in each case had worked five or six years in the same employment, both of them manifested a disturbance of some kind after completing their work, there was no accidental injury, as defined by Judge Parke in the *Miskowiak* case, each had completed his work for some period of time, and both of them died shortly thereafter. In that case compensation was denied by this court; in this case the Accident Commission denied the claimant compensation, and this finding carries with it a *prima facie* presumption that she is not entitled to it. *States Engineering Co. v. Harris*, 157 Md. 487, 146 A. 392.

This case can readily be distinguished from *State Roads Commission v. Reynolds, supra*. There an elderly man, seventy-four years of age, was employed by the State Roads Commission in very light service or work. He was a road patrolman engaged in picking up paper and trash, and doing other light work along the road. On an exceedingly hot day he was removed from his usual work and detailed to assist in loading heavy stones into a truck, in the direct rays of the sun, and while doing that work complained of pain in his chest, and shortly thereafter died as a result of heat prostration. In the instant case the deceased never varied from his usual and ordinary tasks. There was no evidence of undue exposure to heat or cold, nor did he perform any duties not incident to his usual employment, or burdensome beyond those in which he was regularly engaged. In the instant case there was no sharp contact with unusual conditions, or any eventualities beyond those that could be ordinarily expected in his employment. In the case of *Slacum v. Jolley*, 153 Md. 343, 138 A. 244, there was a heat prostration. The employee was operating a bus, on a hot day, without a ventilator. He complained of the excessive heat, and this court said that, to entitle the claimant to compensation, it is essential that there be at least some evidence that her husband died of a sun stroke, or heat prostration, and that such injury was occasioned by some

unusual and extraordinary condition in his employment, not naturally an ordinary incident thereto. That pronouncement of the law applies equally to the instant case and to that case. In *Atlantic Coast Shipping Co. v. Stasiak*, 158 Md. 349, 148 A. 452, the employee developed a hernia while at work as a stevedore, and this court held that he was not entitled to compensation, because there was no evidence that the injury was caused by a strain, or by any condition not incident to the claimant's employment. In the very recent case of *Robertson v. North American Refractories*, 169 Md. 187, 181 A. 223, it was shown that the deceased was working at firing a kiln and was found dead, lying on his back on a coal pile before the kiln and behind his working space, and there were burns on his forehead, his cheek, and left hand. From the presence of these burns, the claimant assumed an accident, product of a heart stroke, and on the theory that the burns preceded the stroke and produced it by shock. This court affirmed the lower court, which denied compensation, and said, "If there was an accidental cause of the death, it is, in this as in all other instances, regrettable that for want of witnesses to prove it the fact cannot be ascertained. But the system erected under the act provides compensation for death or injuries only within a limited class, those from accidents arising out of and in the course of the work, and until an accidental cause is shown, the act cannot apply, and the benefits cannot be extended by the commission, or by the courts on appeal."

There are a number of cases in other states similar in many respects to the case at bar. *Stombaugh v. Peerless Wire Fence Co.*, 198 Mich. 445, 164 N. W. 537; *Carter v. Priebe & Sons* (Mo. App.) 77 S. W. (2nd) 171; *Wilson & Co. v. McGee*, 163 Okl. 99, 21 P. (2nd) 25; *D'Oliveri v. Austin, Nichols & Co.*, 211 App. Div. 295, 207 N. Y. S. 699, 702. All of these cases are important and support the contentions of the appellant herein. In the last cited case the claimant was a fruit packer working in a storage house. He was accustomed to entering an ice box and

taking in or out boxes of fruit or canned goods. On the night before the accident complained of, he was directed that on the next morning he should go into the ice box and bring out a certain quantity of fruit. Heavy overcoats were provided by the employer for the use of the employees during this work. On the day in question he went into the ice box and when he came out he felt cold and had a chill. On the same day he quit work, complained of a pain in his side and developed pneumonia, and upon these facts an award of compensation was granted to him, based upon a finding to the effect that he was subjected to special, unusual, and increased hazards by exposure to a temperature of approximately thirty-five degrees, the result of which was chills, cold, and pneumonia, but the award was reversed on appeal. The facts in that case, and in this case, are very much alike. The court observed that "the mere fact that complainant became cold by reason of continuing to work in [the ice box] was no accident."

The first prayer of the defendant in this case, while not in the usual and best form, directing a verdict for the defendant, should have been granted, because under all the facts there is clearly no right of recovery for the appellee. The prayer in its present form could only accomplish that which would have been the result had the prayer been in the usual and better phraseology. It follows that the first prayer of the plaintiff was improperly granted. The court acted properly in refusing to withdraw a juror and grant a continuance in the case because of the presence in the courtroom of a small child of the deceased and the claimant. This matter was largely in the discretion of the court. Aside from this, it seems that the conduct and presence of the child was not so prejudicial as to justify the court in taking the action sought.

Because of the views above expressed, the other exceptions in this case will not be considered. For the above stated reasons, we must sustain the views of the Acci-

dent Commission, and reverse the judgment from which this appeal is taken.

> *Judgment reversed, with costs, and case remanded for a judgment in conformity with this opinion.*

OFFUTT, J., filed a dissenting opinion as follows:

After a careful examination of the record in this case, I find myself unable to concur in the opinion filed by a majority of the court.

Henry John Linck, while employed as a meat cutter by Henry Heil at the North Avenue Market, died from chronic valvular heart disease. His widow filed a claim for compensation with the State Industrial Accident Commission on the theory that his death resulted from an accidental injury arising out of and in the course of his employment.

The claim was disallowed by the commission, whereupon the claimant appealed to the Court of Common Pleas of Baltimore City. At the conclusion of the trial on that appeal there was a verdict in favor of the plaintiff, reversing the ruling of the commission, and in due course a judgment on the verdict was made absolute in favor of the plaintiff for costs. At the close of the testimony in the case the defendants submitted two prayers, one going to the merits, which was granted, and the following prayer, which was refused:

"The court instructs the jury that there is no evidence in this case legally sufficient to show that the disease from which Henry John Linck died was the result of an accidental personal injury, sustained by him on August 16th, 1935, arising out of and in the course of his employment, and the answer of the jury to the claimant's issue filed in this case must be 'no,' thereby affirming the decision of the State Industrial Accident Commission. (Defendants' Exception No. 14.)"

By the majority opinion the judgment of the trial court was reversed on the theory that the prayer quoted above

was a demurrer to the evidence, and in the opinion it was decided that the evidence submitted on behalf of the claimant was legally insufficient to support a verdict in her favor. Passing for the moment the sufficiency of the prayer to raise that question, I am not able to agree with that valuation of the evidence.

It is axiomatic that, in dealing with a demurrer to evidence, the truth of the evidence is assumed, together with all inferences which may naturally and legitimately be deducted therefrom. There was in the case evidence tending to prove these facts:

Linck at the time of his death was about fifty-six years old. He was about five feet three inches in height and weighed about 118 pounds. He was suffering at the time, and had been suffering for something over a year, from heart disease. He was employed as a meat cutter. Heil had several establishments. One at the North Avenue Market, one on Falls Road, and another on Saint Paul Street, and another apparently on the York Road. Linck was ordinarily employed at the Falls Road plant, but occasionally was sent to other plants or stores. Refrigerating rooms called ice boxes were connected with these several establishments. These rooms or boxes varied in size. Meats were kept in them and the duties of a meat cutter such as Linck was to cut up and trim the carcasses or joints kept in these rooms for the use of the wholesale and retail trade. Occasionally, in the larger rooms, the cutting would be done in the room itself. In the smaller rooms the meat would be carried from the refrigerating room and placed on a bench in the store. The temperature of the refrigerating rooms ran from thirty-two to thirty-four or five degrees. To one entering such a room the temperature seemed lower in the summer than in the winter. On August 16th, 1935, the meat cutter regularly employed at the North Avenue Market was off duty and Linck was sent to take his place. It happened that that day was unusually warm. One witness testified that it was "a pretty hot day on the outside that day; it was a pretty hot day, witness guessed it was a hundred;

but he did not know what the temperature actually was." There was other testimony that the monthly meteorological summary of the United States Department of Weather Bureau showed that on that day the highest temperature was eighty-nine and that the humidity at eight p. m. was seventy-four. It does not appear where that record was made, not even whether it was made in Baltimore.

At the Falls Road store six men were employed, of whom Linck was one. A witness employed there, in describing the duties of the employees, said of men working in the store that, when they needed extra beef, extra pieces, they went down and got them, but that the men working inside the store do not work in the plant; that the box in the store is about eight feet long and about five feet wide, stored with meat; that there were no blocks inside such an ice box; and that the meat kept in them was cut up in the store.

John H. Blucher, an employee of Heil, testified that "now and then when we would cut extra pieces he would cut it downstairs in the box. Q. Downstairs? A. In the store. Q. I don't understand what you mean by downstairs. A. The plant is on the first floor. Q. On the Falls Road? A. Yes, sir. Q. Where would they cut the meat that you need in the store? A. Right up in the store in front of the ice box on the blocks. Q. In front of the ice box? A. Yes, sir."

The same witness further said: "Q. Did you permit Mr. Linck to do any heavy lifting? A. No, haven't this past year, most of the heavy lifting we had somebody else do. Q. Why? A. Henry had complained this year of a very bad heart, and three days before he died he complained of severe pain through here (indicating upper chest)."

The same witness, recalled for the defendant, testified that Linck did some work in one of the boxes in the packing plant, but that he was employed as a meat cutter in the store, and that he cut meat in the cooling room on the first floor about once a week, that he "did that work for pretty nearly three years, anyhow at least that

long." Mr. Heil, the employer, testified that Linck worked in the "cool room" every Friday and as often during the week as they needed cuts of veal or lamb, and, when asked whether Linck had occasion to carry any beef or other meats when working in the cool room, he answered, "Why, no, the only thing Mr. Linck would do in the cool room would be in the way of trimming down a side and cutting a hind quarter, and cutting the loin from the round, or maybe taking a rib out of a fore-quarter or a chuck off a fore-quarter or something like that, but to go down and bone it and fix it in the box, we didn't have the blocks on the inside of the box for that. We didn't have the room to do that in there." He further said that Linck did have to lift quarters of beef and carry them out of the ice box onto the block. Blucher testified that in the Falls Road plant there was no cutting block inside the refrigerator room because the veal and lamb were cut while hanging on the hooks and that the beef was cut also while hanging on the hooks. It appeared, however, that at the North Avenue Market plant quarters of beef were lifted off the hook, put on the cutting block, and cut into smaller parts in the cooling room.

It further appeared that the quarters of beef hung within two feet of the floor and that they weighed from 130 to 160 pounds. Prior to some time in July, 1935, there was no occasion for any meat cutter to go into the cooling room of the North Avenue Market to cut meat, because they had not taken on beef at that market until then, and it does not appear that Linck ever cut meat in that cooling room before August 16th, 1935, the day on which he died.

It further appears that, just preceding his death, Linck was in the cooling room, that, aided by another employee, he lifted two quarters of beef weighing 130 and 160 pounds from their hooks, and that he remained in the room on that occasion about thirty minutes, possibly longer, that while in there he was breathing heavily, seemed to be very cold and shortly after he came out he collapsed and died from heart disease.

Dr. Samuel D. Wolf, a physician, testified that in his opinion death resulted from the combination of two factors, excessive physical exertion from lifting the heavy pieces of beef, and exposure in the freezing temperature for a half hour.

Upon those facts I find it impossible to distinguish this case from that of *State Roads Commission v. Reynolds,* 164 Md. 539, 165 A. 475. In that case the employee was seventy-four years old, and, while not in bad health, his strength naturally was not that of a younger man, in this case the employee was fifty-six years old and was known to be suffering from heart disease; in that case Reynolds was ordinarily employed at light physical labor which one of his age in good health might readily do without danger, in this case, Linck, for about a year before his death, was, because of his physical condition, employed in work less arduous than that assigned to him before his heart condition was known, and he was given no work which involved heavy lifting; in the *Reynolds* case the employee ordinarily did work of a light and desultory character, such as cutting roadside grass, clearing away litter and trash, cleaning drains and the like, in this case Linck was ordinarily employed at a plant where ordinarily he cut the meat in the store and not in the cooling room, but once a week he did some work in that room which did not apparently involve lifting heavy weights; in that case Reynolds was called from his ordinary work on an extremely hot day and ordered to assist in loading heavy cobble stones into a truck, in this case Linck was called from his ordinary work as a meat cutter in a retail store on an extremely hot day and ordered to cut meat in a cooling room with a temperature of thirty-two degrees, where he remained for thirty minutes, and in the course of that work he was required to lift, with the aid of another employee, pieces of beef weighing from 130 to 160 pounds, in such a way that for a time the greater part was on him, as he had the lower end of the piece, lifting it "up off the hook"; in the *Reynolds* case the unusual effort under the conditions imposed a strain

which, because of his age, he was unable to bear, and as a result of which he died, in this case the unusual strain under the conditions imposed a strain on Linck which, because of the condition of his heart, he was unable to bear, and as a result of which he died; in neither case did either the employer or the employee anticipate the danger inherent in the work under the circumstances to the employee. Upon those facts, it is no more open to doubt that Linck's death was caused by his employment than that Reynolds' death was caused by his employment, and the inference, to say the least of it, is permissible, that the employment caused the injury, and that it arose out of the employment.

The inference that it was accidental in its nature is also as reasonable in this as in the *Reynolds* case. Four factors, it may be inferred, contributed to Linck's death: (1) the unusual and severe heat of the day; (2) the shock and depressing effect of passing from that atmosphere into a room at a freezing temperature and remaining there for thirty minutes; (3) excessive physical exertion in that room at that temperature; and (4) his disease. The first three may not have affected a person in normal health, but because of Linck's heart condition their effect on him was fatal. He did not realize the danger, he said before he went in the room he "felt fine," his employer realized the danger of heavy lifting to one in Linck's condition, for Blucher gave this testimony: "Q. Did you permit Mr. Linck to do any heavy lifting? A. We haven't this past year, most of the heavy lifting we had somebody else do," but no danger was anticipated on that occasion, in fact it may well have been thought that Watts, who worked with him, would do the heavier lifting, whereas for a couple of seconds the greater part of the weight of a 160-pound quarter of beef was borne by that frail little man, weighing but 118 pounds and suffering from chronic valvular heart disease, who was "lifting it up off the hook."

Necessarily, the meaning of "accidental" as used in the Workmen's Compensation statute, is not inflexible, but

varies to some extent with the circumstances to which it is applied; nevertheless it always connotes surprise, an occurrence that is not foreseen, designed, or expected. 71 *C.J.* 563.

In *Schemmel v. T. B. Gatch & Sons Contracting & Bldg. Co.*, 164 Md. 681, 166 A. 39, 43, this court said: "The word 'accident' or 'accidental' is usually considered in connection with the phrase 'arising out of,' and, where it seems clear that the injury arose 'out of the employment,' the tendency of the courts has been to give the word 'accidental' a liberal construction in harmony with the general intent of the act, so as to find the injury compensable. As a result of that policy, such an injury as cerebral hemorrhage, when occasioned by some unusual and extraordinary condition in the employment, is by the great weight of authority held to be accidental in its nature," and that interpretation of the word was illustrated by a variety of cases collected in the opinion in that case. Those cases followed *Standard Gas Equip. Corp. v. Baldwin*, 152 Md. 321, 329, 136 A. 644, 647, where the court, after a full consideration of the question, deliberately decided that for an injury to be accidental "there need be no exterior force if the progress of the disease (not occupational) is hastened by some unusual strain or condition in the course of work." That conclusion is not only consistent with the weight of authority (71 C. J. 563 *et seq.*), but is consistent also with the purpose and meaning of the whole scheme of workmen's compensation. That is not, indeed, a plan of industrial insurance, but a plan to divide primarily between capital and labor the losses arising from injuries to workmen incident to the hazards of industry, with a view of imposing those losses upon the whole business as an expense of operation. It involved concessions both by capital and labor, and under it each sacrificed some possible contingent benefits and advantages for certainty and security. To accomplish its beneficent purpose, it was essential that it be interpreted and administered liberally to effect its intent; every consideration, social, economic,

and humane, favored that policy, and it was clearly adopted as the policy of this court. The conclusion reached in this case appears to me to reverse it, and to favor in lieu thereof a narrower, technical, formalistic policy, in conflict with the plain, sound, and healthful policy of the statute.

Apart from that consideration, the question was not even raised in this case. The so called demurrer to the evidence has no possible reference to the claimant's right to compensation. The only question which it raised was whether there was evidence legally sufficient to show that the "disease" from which Linck died was the result of an accidental injury, etc. It was conceded that Linck died from heart disease, nobody contended that an accidental injury caused that disease, but the question was whether, he having that disease, its course was accelerated and his death caused by an accidental injury.

Article 5, section 10, Code, precludes this court from considering any question not tried and decided by the trial court. The point upon which this case is decided was not presented to the trial court, could not therefore have been tried by it, and is not before this court for review. Article 5, section 10, Code, and annotations of Bagby and Flack. Since the trial court correctly, in my opinion, refused that prayer, the judgment should have been affirmed.

URNER and MITCHELL, JJ. also dissent.