Ramón Montaner, as Manager of the State Insurance Fund, Appellant, *v.* The Industrial Commission of Puerto Rico, composed of Manuel León Parra, Chairman, and F. Paz Granela and Juan M. Herrero, Commissioners, Appellee, and Josefina Fuentefría et als., Petitioners before the Commission.

No. 155.   Argued March 6, 1939.—Decided May 9, 1939.

*B. Fernández García, Attorney General of Puerto Rico; Emilio de Aldrey, Assistant Attorney General,* and *L. Negrón Fernández* (for the State Insurance Fund), *for Appellant; M. León Parra, for the Commission; Virgilio Brunet* and *F. Rebollo López,* for petitioners before the Commission.*

Mr. Justice De Jesús delivered the opinion of the Court.

On July 20, 1935, workman Miguel Parque was at work unloading coal from a hatch of the steamship Comerío, of the N. Y. & P. R. S/S Co., anchored at the port of Fajardo. His work consisted of shoveling the coal from the stowage to a large tub. He began working at 7 o'clock in the morning and stopped at noon for lunch. He resumed his work at 1 p. m.

and about 2:15 more or less he fainted or collapsed and as a consequence he died a few minutes later.

It appears from the evidence that the hatch where Parque was working was the hottest one of the ship. It has no ventilation aside from the small opening called *half-hatch* by the workmen, and the place where the winch comes through. The rest is closed. The heat there is so intense that frequently the laborers are obliged to take off their clothes from the waist up. The fact that they had to cover their mouth and nose with handkerchiefs rendered working conditions even worse. Sometimes the suffocating heat made it necessary for them to come to deck in search of fresh air.

These were the conditions under which according to the evidence Parque was working when he met his death. Describing the accident his co-workers testified that after having recessed from 12 to 1 in the afternoon for lunch, and after having worked continuously since 7 in the morning, about ¾ of an hour after he resumed his work, he fell over when he pushed the shovel to take coal. His face was blackened, the tongue was hanging out, he perspired profusely and was trying hard to breath. Seeing him in this condition, his fellows took him out of the hatch but he died immediately thereafter. We should also add that for years Parque had done this kind of work, and had worked carrying sacks weighing 300 pounds, when he was not working with coal.

The Manager of the State Insurance Fund rendered a decision on the 11th of January, 1936, stating that workman's death was not caused by an accident within the scope of his employment, in accordance with the provisions of Act No. 45 of 1935 (Session Laws (1), p. 250) and therefore denied compensation.

The petitioners, the widow and the illegitimate daughters of the deceased, appealed to the Industrial Commission, and the latter after hearing the evidence on both sides, reversed the decision of the Manager and decided that Parque's death was caused by an accident within the scope of his work, and

that his dependents, that is, his widow Josefina Fuentefría, and his illegitimate daughters, minors, Manuela Josefina González and Angela Amaro, were entitled to receive compensation, in accordance with paragraph 16 of Section 3 of Act No. 45 of 1935, and the Regulations thereof.

The Manager felt aggrieved and filed this writ of review in which he assigns two errors as having been committed by the Industrial Commission, to wit:

"*First:* The conclusion reached by the Industrial Commission in regard to the cause of the death of the workman Miguel Parque is not sustained by the medical testimony in this case.

"(*a*) Because the report of the School of Tropical Medicine does not establish any cause, but only indicates as a mere possibility that heatstroke might have been the cause, and

"(*b*) Because the testimony of Dr. Luis C. Boneta stating that certainly the cause of the death was heatstroke, is insufficient as a basis for the decision of the Commission, as that was a mere conclusion with nothing to sustain it.

"*Second:* The Commission erred when it decided that said workman's death was brought about through an accident within the scope of his work, because death caused by heatstroke is not an accidental death, within the provision of Section 2 of the Workmen's Compensation Law."

██ Section 11 of Act No. 45, cited above, when it conferred jurisdiction on this Court to review the decisions of the Industrial Commission, expressly limited the proceedings to a review of questions of law. This limitation, however, does not mean that the Commission may act arbitrarily and consider as proved an essential fact without legal and competent evidence to sustain its conclusion; otherwise the due process clause of the Constitution would be violated.

In the case of *Jillson* v. *Ross,* (1915) R. I., 94 Atl. 717, it was held by the Supreme Court of Rhode Island that a conclusion of facts entirely unsupported by the evidence constitutes an error of law and should be reviewed and set aside by the appellate court. In *Employers' Assurance Corporation* v. *Industrial Acci. Comm.,* (1915) Cal., 151 P. 423, it was

held that a compensation based on hearsay evidence could not be sustained, and in *Rec.* v. *Whittlesberger,* (1914) 181 Mich. 463, 148 N. W. 247, .it was held that to consider conclusive facts declared by the Industrial Accident Board as having been established, the conclusion of fact should be based on legal competent evidence, and not mere supposition, guess or conjecture, nor in rumors or incompetent evidence. See the · extensive notes on this matter in L.R.A. 1916-A, pp. 23, 266, and L.R.A. 1917-D, 80, 188, and cases cited.

Having established this premise let us see whether there is legal competent evidence to sustain the conclusion reached by the Industrial Commission to the effect that Parque died as a consequence ·of heatstroke.

First we have the testimony of the fellow-workers, of the deceased who described the conditions under which he was working as well as the external symptoms which preceded his death and which could be easily observed by them. Then we have the report of the School of Tropical Medicine, which, though reaching the conclusion that the cause of the death is not evidenced from the examination performed on the viscerae, it mentions the possibility that it may have been caused by heatstroke. Finally we have the expert testimony of Dr. Luis C. Boneta, which is not based in conjectures as the appellant alleges, but on the evidence admitted by the Commission and on the report of the School of Tropical Medicine.

It is true that the report of the School of Tropical Medicine erroneously starts by assuming that the deceased was working in a boiler room, but it is also true that he was working in the hatch we have referred to, whose temperature and ventilation conditions were much like those of a boiler room.

From the resolution appealed from we take the following paragraphs, which summarize Dr. Boneta's testimony:

"Dr. Boneta testified that the report of the School of Tropical Medicine says there was congestion of the lungs, congestion of the

brain, swollen liver, all of which are ordinary causes of sudden death in the tropics; that there are people who suffer these symptoms and do not know it, and that no one notices it, until death occurs; that the most important one is the congestion of the lungs and of the brain; that the witnesses have testified that Miguel Parque ate lunch between 12 and 12:30, and almost immediately, at 1 o'clock, he renewed his work in a room which was very hot and where the temperature was very high, right after eating and with the stomach full, and that he fell dead after having profusely perspired; that those happenings and symptoms are characteristic of heatstroke even without considering the report of the School of Tropical Medicine; that if he had not seen said report he would have been of exactly the same opinion after having considered the symptoms and the happenings in the case; that a strenuous work under a high temperature may produce asphyxia, that is a paralysis of the motors, where beathing is especially paralized; that it almost always occurs when one is in a room where there is little oxygen; that the possibility that the man in question was suffering from a heart disease, is eliminated when we consider that Miguel Parque was working also carrying 315-pound sacks. Counsel for the State Insurance Fund asks that we disregard the testimony of Dr. Luis C. Boneta because it is based on erroneous facts.

"Dr. Luis C. Boneta continues testifying in answer to questions put by counsel for the petitioner, that a person who suffers of a heart disease can not carry 315-pound sacks because death would ensue; that had the workman in question had a heart disease he would have died when exerting himself to carry 315-pound sacks; that a lesion in the muscles of the heart may be chronic; that had deceased suffered of a chronic disease in the mitral valve he would have died when lifting 315-pound sacks; that the pulmonary and brain congestions indicate there was asphyxia; that a person may die of asphyxia immediately or may last a few minutes; that where death is caused by a disease of the heart the person dies immediately; that sometimes the patient lives a while; that the symptoms of these deaths are much alike, but there is no reason why a bulbar death should leave oedema of the lung; that according to the pathological data furnished by the School of Tropical Medicine, congestion of the lung and oedema and congestion of the brain, indicate that it was a case of asphyxia; that in stating his opinion he excludes absolutely the possibility that death was caused by a lesion

in the mitral valve; that the School of Tropical Medicine suggests heatstroke as a possibility, but he is sure that the cause of the death of the laborer in this case was heatstroke.''

The conclusion reached by the Industrial Commission as we have seen is not arbitrary nor entirely devoid of all evidence to sustain it. Therefore we should not reverse it, whatever the conclusion we might have reached; we should not substitute our judgment for that of the Commission established by the law for this purpose.

It seems to us that the first error assigned was not committed.

■■ Let us consider the second.

Workmen's Compensation Laws, wherever they exist, are based on just humanitarian ideals and a firm sense of social justice. They originated toward the end of the last century when the state became convinced that putting the loss of industrial accidents on the workman and his family who were the least prepared economically and socially to suffer it, was highly unjust. The defenses which were available to the master against the claims of the servant, such as assumption of risk, the fellow servant rule, contributory negligence and others, and the slowness of the remedy which after overcoming all these legal barriers the courts of law could offer, rendered illusory judgment in favor of the laborer and his relatives, because rarely did they obtain a favorable decision, and when they did so, poverty and hunger forced a sale of it for a fraction of its worth. It was to remedy these evils that special legislation sprung concerning workmen's compensation and commissions and boards, which have been set up with different names to decide these claims in a summary manner, though always in harmony with the due process clause of the Constitution.

For an instructive though brief discussion of this matter see Article by Professor Francis H. Bohlen, of the Pennsylvania Law School, entitled ''The Drafting of Workmen's

Compensation Acts," published in 25 Harvard Law Review 328, and that of Dean Pound, of Harvard, entitled "The End of Law," published in 27 Harvard Law Review 195.

The note cited above in L.R.A. 1916-A, 23, 215, in discussing the interpretation of Workmen's Compensation Laws says:

"Notwithstanding the compensation acts are in derogation of the common law, the courts have generally held that, being highly remedial, they should be broadly and liberally construed. A contrary view has apparently been taken by the Michigan court. And probably none of the courts would give the act such a broad construction as to include employees or accidents not within its provisions either by express language of the act, or by a necessary implication therefrom although the Washington court has said that the act should be cnostrued ot include those within the reason, although outside the letter, of the statute."

Section 2 of Act No. 45 of 1935, provides in its pertinent part:

"Section 2.—The provisions of this Act shall be applicable to all such workmen and employees working for the employers to whom the following paragraph refers, as suffer injury, are disabled, or lose their lives by reasons of accidents caused by any act or function inherent in their work or employment, when such accidents happen in the course of said work or employment, and as a consequence thereof; . . . "

Appellant alleges in his second assignment that a death resulting from heatstroke is not an accidental death within the meaning of Section 2 of the law. He argues that one may not get compensation for a death or injury unless it is a personal injury by accident. He relies on the case of *Bailey et al.* v. *Henry Knapp & Co.* (decided by the Supreme Court of Michigan in 1938), 279 N. W. 875, where it was held that a worker's death resulting from heatstroke is not a compensable accidental death within the provisions of the Workmen's Compensation Act, unless accompanied by unusual and unexpected circumstances.

The question is new in this jurisdiction. Therefore we are free to adopt whichever interpretation accords best with the spirit and purpose of the law.

The reason the Supreme Court of Michigan seems to have had in mind for interpreting strictly the Workmen's Compensation Act, appears to have been the ancient maxim that statutes in derogation of the common law should be strictly construed. *Andrejwiski* v. *Wolverine Coal Co.*, (1914) 182 Mich. 298, 148 N. W. 684.

In his Article "The Common Law in the United States," Judge Stone of the Supreme Court of the United States, criticizing the tendency of·the courts to unduly restrict statute law refusing to grant it the elasticity conceded to legal principles which emanate from judge-made law, has stated that in the interpretation of the kind of statutes here concerned, there should be very little room for the application of the old maxim which tends to destroy the clear legislative intent to elevate the Science of Law to the same level of progress reached by her sisters Political Economy and Sociology. See 25 Harvard Law Review, pp. 4, 18.

From the Bailey case itself, the hesitation of·the Supreme Court of Michigan emerges, and one may see that its decision is based rather on the doctrine of stare decisis than on legal principles. The court says:

"Although we are mindful of the statutory differences in other jurisdictions, we have nevertheless examined the 'sunstroke' and 'heat prostration' decisions of other courts of last resort. Thirteen of these hold that sunstroke and heatstroke are 'accidents' within the meaning of their compensation acts. (Cases.)

"Contra are Kentucky, whose statute limits compensable diseases to those caused by traumatic accident (see Smith v. Standard Sanitary Mfg. Co., 211 Ky. 454, 277 S. W. 806), and perhaps Maryland (Slacum v. Jolley, 153 Md. 343, 138 A. 244, 245). But see State Roads Commission v. Reynolds, 164 Md. 539, 165 A. 475.

"However, we have held that heatstroke is not, in itself, an 'accidental' injury."

Let us see what Professor Bohlen says in disagreement with the Supreme Court of Michigan in his article above cited:

"Since the case of Fenton v. Thorley, nothing more is required than that the harm that the plaintiff has sustained shall be unexpected. It is no longer required that the causes external to the plaintiff himself, which contribute to bring about his injury, shall be in any way unusual; it is enough that the causes, themselves known and usual, should produce a result which on a particular occasion is neither designed nor expected. The test as to whether an injury is unexpected and so if received on a single occasion occurs 'by accident' is that the sufferer did not intend or expect that injury would on that particular occasion result from what he was doing. What was actually probable or even inevitable because of circumstances unknown to the sufferer is even more unimportant. The test is purely subjective to the injured workman."

The rule of construction which the Supreme Court of Michigan has applied in construing this law which is founded on social justice is not in harmony with its purpose which being remedial, was inspired in the protection of the worker and his family, and should be liberally construed to attain the ends sought by the legislator. We prefer to follow the liberal interpretation adopted in England and 13 courts of last resort in the United States, and as it is clear that when the worker met his death he had no reason to expect the mishap which followed, because it was the type of work he had been doing for years without accidents, we must conclude that the Industrial Commission did not err when it decided that Miguel Parque suffered an accident caused by an act or function inherent in his work, and which occurred in the course of his employment and caused his death.

In view of the foregoing, the order of the Industrial Commission of Puerto Rico, of August 1, 1938, should be affirmed.