STANCLIFF *v.* H. B. DAVIS COMPANY ET AL.

[No. 11, October Term, 1955.]

*Decided November 7, 1955.*

*Motion for rehearing filed November 21, 1955, denied November 30, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Maurice J. Pressman*, with whom was *Leon H. A. Pierson* on the brief, for the appellant.

*Daniel E. Klein* and *W. Giles Parker*, with whom was *Albert A. Levin* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

In an appeal from a decision of the Industrial Accident Commission that the death of an employee was not the result of an accidental injury, the parties stipulated that the only question to be answered by the lower court, and this Court, is the legal sufficiency of the evidence. If the lower court found the evidence legally insufficient to permit a finding that the employee sustained an accidental injury or that his death was the result thereof, it was to answer the issues in favor of the employer and the insurer, and if it found to the contrary, in favor of the claimant. It found that the evidence was legally insufficient and the employee's dependent mother has appealed.

The employee was a young man of twenty. His only previous employment, by a construction company, had lasted but a month, and after a period of inactivity, he sought work at the plant of a paint manufacturer, one of the appellees. A medical examination by the company's doctor found him physically fit and he was hired and assigned to the varnish department. His mother testified that when he came home from work on the first day,

he had no color in his face, was short-winded and said he had been vomiting, coughing and spitting up blood all day. He attributed all of this to the varnish fumes at the plant. After three days in the varnish department, a total working time of some eighteen hours, he was transferred, at his request, to the packing and labelling department, which is well away from all other departments and in which he handled only sealed cans. However, he continued to cough and vomit, not only at work but at home, to the point that he had to quit work about three weeks later. His mother took him to the Johns Hopkins Hospital where he remained until his death ten days later. He told several doctors at the hospital that his health had been good until he went to work in the varnish department and that he became nauseated from the varnish fumes and vomited each day about an hour or two after arriving at work.

For the first three days of his employment the boy worked in the open air in the yard area of the varnish department. His duties were to roll fibre board or metal drums on hand trucks, or on the ground, to large kettles, and then to open the drums with an axe. The contents—in some cases a resinate composition and, in others, a petroleum solid known as gilsonite—he broke into smaller pieces with the axe, just as you would break up pieces of coal, and then put them into the two hundred gallon capacity kettles. This, according to the superintendent of the department, created no appreciable dust, and no fumes. The employee did not handle any powders or liquids, only the drums and the solids in the drums. When loaded, the kettles were rolled on their own rollers from the open yard into a room called a stack area. The room contained no windows and just one small door. In the room were oil burners, flush with the floor, and the kettles were rolled over these and under stacks which were just above and slightly larger than the top of the kettles, so that heat and fumes were carried off. The other ingredients needed to make the varnish, such as lime, manganese borate, litharge, manganese naphthonates, co-

balt, lead acetate, and xylol, were all handled by the man who was in charge of the kettles and the mixing of the varnish in the stack room, or his assistant, and by nobody else. It was testified that one in the yard on a summer day would not notice any odors from the stack room. After the brew in the kettles had been cooked for the proper length of time, the kettles were wheeled into the yard again and taken into another room for further processing. A supervisory employee of the paint company testified that in the twenty-three years of his experience with the same operations, no one had ever had any ill effects in the varnish area. It was shown that at all times during the work of the employee, conditions were normal, usual and just as they were during all other times of operations, and that nothing abnormal, unusual or extraordinary had occurred during the time he had worked.

After it was shown that the conditions and procedures he observed were the usual and normal conditions and the same as those prevailing during the time the boy worked, a toxicologist attached to the office of the medical examiner of Baltimore and an assistant professor of legal medicine at the University of Maryland Medical School, testified that he had spent an hour in the varnish department, both outdoors and within the stack area. His description of working processes and effects coincides with those of the employees of the paint company. He found no hazard in the work. He was asked about a report he had given a firm of analytical chemists in which he said: "However, if severe coughing were induced by exposure to irritant dusts of some of the above substances (lime, resin, litharge, etc.), such coughing could produce a fatal result in an individual with a pre-existing cardiac condition such as the deceased had." He said that his hypothesis was based on information furnished him, whereas his opinion on the witness stand was based upon "personal observation of the area, which I said before was dust free." He was asked about odor and fumes and his answer was: "The only odor produced

by fumes in that area was a slight tar like odor * * * and that was the only odor." When he was asked if he had seen any cooked kettles brought into the yard area, he said: "There was one brought out into the area as I mentioned before. In fact I put my face right over it." He enumerated each of the products which were put into the kettles either before or after the heating process, one by one, and said that none were toxic or would be irritating to the nose or throat. Some would have a slight odor, but none would cause fumes.

The medical testimony was all in agreement as to the fact that the employee had suffered from rheumatic heart disease for at least a year and probably longer. It differed as to the part his employment played in his death. The assistant medical examiner, who performed an autopsy, testified that the boy had rheumatic myocarditis, mural thrombosis, and chronic passive congestion of the liver, and that he died of heart failure. He said that one who was about to go into an acute phase of rheumatic myocarditis will cough and gasp for breath from the effects of the heart trouble and also, if the failure is severe enough, vomiting will occur, and that all of these symptoms would persist over a period of three weeks. He testified that if the boy inhaled fumes or dust that produced coughing and vomiting "* * * it could increase the extent of cardiac failure to such a degree that he would more rapidly and at an earlier date go into heart failure and die." The senior assistant resident of the hospital testified that if the employee had inhaled fumes which caused or aggravated the coughing, "it was possible" that it made the heart failure worse and led to his death. The employer and the insurer, on the other hand, produced two specialists who testified that the boy had rheumatic heart disease for from one to three years, that an acute phase of the disease occurred after he began work, that the nausea and vomiting were due to poor circulation in the stomach, that he died of acute rheumatic myocarditis, superimposed on an existing rheumatic heart disease, and that all of his symptoms

were those of, and due to, heart failure. One of the doctors pointed out that people with rheumatic heart disease, such as all medical witnesses agreed the boy had, can die either of prolonged mechanical strain upon a heart that has been damaged, or as a result of an acute inflammatory reaction "so that a person who has never had rheumatic fever before can have acute process today and die within a week, two weeks, or three weeks of the acute inflammatory process * * * so that I believe his death was a result of active inflammatory rheumatic myocarditis."

The toxicologist who had examined the processes and procedures of the plant where the boy worked, testified that the symptoms of no color, vomiting, coughing and spitting of blood, did not, in his opinion, come from any hazard or thing connected with his employment and said further that the symptoms could have been caused by any number of things, including "* * * the aftermath of an alcoholic debauch, particularly with the bad heart the man had. The heart itself might have gone into a terminal episode of heart failure, which could have been accompanied by all these symptoms." There was evidence that for several years the boy drank beer and spirits daily and at times to excess.

We must determine whether there can be gleaned from this evidence enough to permit a finding that the employee suffered an accidental injury. In so doing, we, of course, apply the familiar rule that where there is any evidence from which a rational conclusion to support the claim may be drawn, the weight and value of that evidence must be left to the trier of the facts. We assume the truth of all the evidence tending to sustain the claim and of all inferences fairly deducible from it. We do not weigh the conflicting evidence to determine its comparative weight, but decide only whether there is any evidence legally sufficient to permit the finding sought by the claimant. *Havre de Grace Fire Works Co. v. Howe,* 206 Md. 158, 110 A. 2d 666.

The appellant presses us to find that the testimony that fumes produced coughing and vomiting which aggravated the heart condition and hastened death, is enough to meet the requirements of the statute. Code, 1951, Art. 101, Sec. 14, requires compensation to be paid for disability or death of an employee "* * * resulting from an accidental personal injury sustained by the employee arising out of and in the course of his employment * * *." We are asked to give full effect to the provisions of Code, 1951, Art. 101, Secs. 64-65, which provide that the statute is not to be strictly construed as in derogation of the common law, but rather, shall be so interpreted and construed as to effectuate its general purpose, and that in the absence of substantial evidence to the contrary, it is to be presumed that the claim comes within the provisions of the article. The appellant urges that this is highly important because the Court has not followed *Victory Sparkler and Specialty Co. v. Francks,* 147 Md. 368, and because of "* * * the apparent tendency of this Court to veer away from this liberal construction policy as is shown by the interpretation given to the meaning of the term 'accidental injury' * * *" by the later cases, and asks why Maryland should set itself apart from the great weight of authority by holding that an injury is accidental only if it results from some unusual strain, exertion or condition in the employment. She asks the Court to follow the rule of *Fenton v. Thorley* (1903), A. C. 443. There Fenton injured himself while trying to turn a wheel. There was no slip, wrench or sudden jerk. Professor Francis H. Bohlen, in speaking of the effect of that decision, says in 25 Harvard Law Review, 328, 340: "Since the case of *Fenton v. Thorley* (A. C. 443), nothing more is required than that the harm that the plaintiff has sustained shall be unexpected. It is no longer required that the causes external to the plaintiff himself, which contribute to bring about his injury, shall be in any way unusual; it is enough that the causes, themselves known and usual, should produce a result which on a particular occasion is

neither designed nor expected." The appellant says that the Court should return to this interpretation of the statute, so that the word "accidental injury" should be deemed to include unexpected results as well as accidental causes, which is the rule in most jurisdictions. This interpretation was rejected in *Jackson v. Ferree,* 173 Md. 400. There, while a mechanic was putting a wheel on a truck, it stuck. Pain came on, and he suffered a heria. The Court pointed out that the claimant did not slip or fall and, when injured, was doing the work he was employed to do and customarily did. It was held that the evidence was legally insufficient to sustain a finding of accidental personal injury. In *Kelly Springfield v. Daniels,* 199 Md. 156, the worker was stricken with pain and suffered a rupture disc while lifting one side of a not unusually heavy bag. He was performing the same duties he had performed in the same manner for some five months. He did not fall or slip and nothing fell upon or struck him. The Court held that he had not suffered an accidental personal injury. The opinion noted that the great weight of authority is that the sudden and unexpected rupture of some portion of the internal structure of the body or the failure of some essential function of the body, resulting from the exertion of the employee in the doing of his work or the conditions of the employment, even without any external happening of an accidental nature, is an accidental injury. It was held that the Maryland rule was narrower since this Court has held repeatedly that such a rupture or failure "* * * is held to be accidental injury only when it results from some unusual strain or exertion of the employee or some unusual condition in the employment." The opinion relied on *Jackson v. Ferree, supra,* and cited, as a striking illustration of the Maryland construction, the opinion and holding in *Heil v. Linck,* 170 Md. 640. The rule was reaffirmed in *Caled Products v. Sausser,* 199 Md. 514, and we find it too firmly established for the statute now to have the broad interpretation sought.

The appellant goes beyond asking for a liberal interpretation of the statute. She says that even under our decisions, it is not necessary to find that the fumes and dust which the boy inhaled were unusual, but only that the coughing and vomiting which subjected him to unusual exertion and strain, which in turn aggravated his heart condition, were unusual and, so, made the injury unintended, unexpected and without design and, therefore, an accidental personal injury within the meaning of the Maryland cases. We think that this argument is no more than bending the facts to meet the law on the assumption that we will not bend the law to meet the facts. It is not contended that the work that the employee did in the packing and labelling department subjected him to fumes or dust, but rather that the coughing and vomiting, which started in the varnish department, continued of its own momentum there and while he was away from the plant. The evidence was that there was no dust in the place in which the deceased worked, but if the boy's statements that varnish fumes were the cause of his coughing and vomiting be taken at full value, as they must, there remain the uncontroverted facts that conditions during the time he worked were the same as they had been for many, many years in the place he worked and that they had not caused any complaints or difficulties in all of those years, as well as that nothing unusual or extraordinary occurred during the three days he worked in the varnish department and that during all of the time he worked, he performed the duties for which he was employed in a customary and usual manner. The argument that the coughing and vomiting amounted to an accidental injury because they were unusual or unexpected must fall before the decided cases. In *Gunter v. Sharp & Dohme,* 159 Md. 438, the claimant contended that the nephritis or Bright's disease, from which he suffered, resulted from an accidental injury, said to be the inhalation of fumes or dust arising from the mixing of bichloride of mercury and cyanide of potassium powders in a closed room. This Court affirmed

the withdrawing of the case from the jury. In *Heil v. Linck,* 170 Md. 640, *supra,* relied on by the Court in the *Kelly Springfield* case, the deceased, a meat cutter, cut meat in cooling rooms of a market from time to time. On the day he died, with the help of another employee, he carried quarters of beef weighing between one hundred thirty and one hundred sixty pounds to the cutting block in the cooling room and then remained in the room for about half an hour cutting up the meat. The temperature in the cooling room was thirty-two degrees, while in the market, it was eighty-nine degrees. Some fifteen minutes after he returned to the market, he dropped dead. The Court said he had not suffered an accidental personal injury. Judge Offutt, dissenting, pointed to the fact that the deceased had been suffering from heart disease and said there were three other factors which contributed to his death and made it accidental: one, the unusual heat; two, the shock of passing from the high outside temperature to the low temperature in the cooling room; and three, the freezing temperature of the cooling room. The Court held, however, that the employee worked in the cooling room as part of his regular employment in his customary manner, that the outside temperature was not unusual for the time of year, and that no unusual external condition was present, so that the injury was not accidental. In *Cambridge Mfg. Co. v. Johnson,* 160 Md. 248, the claimant suffered from tuberculosis claimed to have been brought on or aggravated by the inhalation of dust in a feed mill where he worked in a poorly ventilated room, and it was held that there was no accidental injury. In *Miskowiak v. Bethlehem Steel Co.,* 156 Md. 690, 695, the deceased, a tall, strong and healthy man, was employed for six years in the same work. On an April day, warm and sticky for that time of year, he worked all day, taking red hot bars out of the blast furnace. This was his customary work. After his day's work was done, he left the furnace, went some five or six feet, collapsed from heat prostration and later died. The Court said: "The employee had been engaged

in a routine performance of his daily labor, and had completed his day's work without receiving any injury by impact or contact, or as the result of an unusual muscular exertion or unexpected movement. There is no question, however, that he died of heat stroke or prostration, but, before his injury may be held compensable, there must be legally sufficient evidence that the workman, in the language of Judge Offutt, speaking for the Court in *Slacum v. Jolley*, 153 Md. 351, 353, 'died of heat stroke or heat prostration, and that such injury was occasioned by some unusual and extraordinary condition in his employment, not naturally and ordinarily incident thereto'." Changes in the statutes, such as making occupational diseases compensable, have not weakened the force of these cases as applicable to the question before us.

Each case relied on by the appellant may be distinguished from this case, in that the Court found some unusual or extraordinary condition of the employment or in the doing of the work by the employee. In *Union Mining Co. v. Blank*, 181 Md. 62, there were typhoid bacteria in the drinking water furnished to the employees by the employer. In *Schemmel v. Gatch*, 164 Md. 671, the cerebral hemorrhage was induced by work on a day which was so hot—100° in the general area, and 110° in the quarry into which the employee had to descend— that other employees had been directed to stop work. In *Geipe v. Collette*, 172 Md. 165, the horror of being about to run over a man who appeared suddenly just ahead of the truck, and the swerving by the truck driver to avoid him, caused the cerebral hemorrhage. The case most nearly like that of the instant case on the facts, is the Ohio case of *Ind. Comm. v. Polcen*, 169 N. E. 305. The Ohio statute does not require the injury to be accidental and its courts have adopted the liberal interpretation advocated by the appellant. The claimant, almost overcome by sulphuric acid fumes, went outside and "almost strangled from coughing" and suffered a hernia. The Court distinguished cases in which disease or bodily changes result from working conditions calculated to

cause the illness over a period of time, pointing out that the element of trauma was there lacking, while in the case before it there was a compensable injury because "* * * here we have presented a specific emission of fumes, which resulted in the specific coughing fit, accompanied by a tearing of the abdominal tissues at about that specific time."

In the case before us, the employee during his working hours did all he was required to do in a routine manner. At no time was he injured by physical impact or contact, nor did he undergo any unusual exertion or unexpected movement. There was no extraordinary or unusual condition or happening in the operations of the employer. Everything that was done or happened while he was working was naturally and ordinarily incident to the operation of the department as it was customarily carried on. There is no doubt that the coughing and vomiting were unusual and unexpected but nothing else, in action or environment, was.

We think the court below was right in holding that there was no legally sufficient evidence that the employee suffered an accidental personal injury arising out of, and in the course of, his employment.

*Judgment affirmed, with costs.*