14 A.3d 678

**PRO–FOOTBALL, INC. et al.**

v.

**Thomas TUPA, Jr.**

**No. 1839, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Feb. 28, 2011.

464

David O. Godwin, Jr. (Elizabeth D. Cardona, Godwin, Erlandson MacLaughlin, Vernon & Daney, LLC, on the brief), Ellicott City, MD, for appellant.

Benjamin T. Boscolo (Gerald Herz, Chasen Boscolo Injury Lawyers, on the brief), Greenbelt, MD, for appellee.

Panel: EYLER, DEBORAH S., ZARNOCH and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

ZARNOCH, J.

Appellants Pro Football, Inc. and Ace American Insurance Co. urge us to reverse a workers' compensation award granted to appellee, Thomas Tupa, for an injury sustained while employed as a professional athlete in the National Football League (NFL). Pro Football, a Maryland corporation, is in the business of operating the Washington Redskins football team. Tupa was employed as a punter for the team from 2004 until 2006. While warming up for a Redskins preseason game at FedEx Field in Landover, Maryland in August of 2005, Tupa claimed that he injured his lower back when he landed awkwardly after a punt. He sought immediate medical treatment and has not played football since.

Tupa filed a claim with the Maryland Workers' Compensation Commission on March 30, 2007 requesting temporary partial disability benefits for the period beginning March 1, 2006 and continuing to the present. Appellants contested Tupa's claim, on three grounds: (1) Maryland did not have

jurisdiction over the claim, (2) appellee did not suffer an "accidental injury" arising out of and in the course of his employment, and (3) there was no causal connection between appellee's August 19, 2005, injury and his ongoing disability. After a hearing held on March 3, 2008, Commissioner Patricia G. Adams found that Maryland, rather than Virginia, had jurisdiction and that Tupa's disability was caused by an accidental injury suffered in the course of his employment. The Commissioner ordered appellants to pay Tupa compensation for his temporary partial disability and related medical expenses.

Appellants noted a timely appeal to the Circuit Court for Prince George's County and requested a jury trial. The trial was held August 31 and September 1, 2009. Although they disagreed over the legal issues of whether jurisdiction over the claim was in Maryland or Virginia, the parties stipulated that there was no factual dispute underlying the question. Consequently, the court determined as a matter of law that Maryland had jurisdiction. The jury found that appellee suffered an accidental injury, that his disability was causally connected to that actual injury, and that he was entitled to benefits for the time period from February 1, 2006 to February 28, 2007.

## QUESTIONS PRESENTED

Appellants present the following issues for our review:

1. Whether the circuit court erred in determining that Maryland has jurisdiction over the appellee's claim, when the appellee signed a contract agreeing to bring all workers' compensation claims in the Commonwealth of Virginia?

2. Whether the circuit court erred in affirming the Maryland Workers' Compensation Commission's finding that the appellee sustained an accidental injury arising out of and in the course of his employment on August 19, 2005?

For the reasons set forth below, we affirm the circuit court's decision.

## FACTS AND LEGAL PROCEEDINGS

In 2004, Tupa signed a four-year contract with Pro Football to punt for the Redskins. In January of 2005, prior to the start of the 2005–2006 season, Dr. Thomas Schuler of the Virginia Spine Institute examined Tupa to assess his complaint of mild lower back pain. Dr. Schuler concluded that Tupa had "significant underlying spondylosis and stenosis" with some evidence of nerve problems in his right leg, but the physician did not feel that it would affect Tupa's ability to play the next season, given that he had successfully completed the entire 2004–2005 season with the same condition. Dr. Schuler stated that he expected appellee "should be able to play one or two more seasons before this catches up with him."

The injury underlying this claim happened during pre-game warm-ups on August 19, 2005 at FedEx Field in Landover. According to appellee, he was about three quarters through his regular warm-ups when he landed awkwardly after a punt. He felt a sharp pain in his lower back, which he described as a "jarring" sensation. He immediately sought medical attention and was placed on a Medrol Dosepak according to the instructions of Dr. Schuler. The physician evaluated appellee two days later. He noted that appellee reported "95% back pain" and some residual numbness and tingling in the left foot. After reviewing an MRI, Dr. Schuler observed "significant progression of the disc degeneration ... [t]hat clearly progressed significantly from a year ago with much more collapse." He also found "subarticular stenosis of a mild nature ... with mildly enlarged facet joints."

Dr. Schuler saw Tupa again the next day, August 23, 2005, and reviewed recent pelvic and spinal x-rays which showed "significant spurring anteriorly ... with a slight retrolisthesis." Dr. Schuler concluded that Tupa had significant discogenic pain and would be a good candidate for surgery, if necessary. Regarding his ability to play in the NFL, Dr. Schuler stated that "he has to get this calmed down" first and that he would consider an intradiscal steroid injection "as a last ditch effort to get him back to a functional status."

Tupa's pain had not improved at his next evaluation on September 2, and the numbness and tingling sensation in his feet persisted. Dr. Schuler stated that they planned to give it some more time to improve with nonoperative care. He concluded that "the patient is still disabled from participating in the NFL, and he is still working aggressively in his rehabilitation to get back to a functional pain-free status."

Appellee's condition remained the same throughout the 2005 season, with little improvement despite treatment that included medication and physical therapy. At his end of season evaluation in January 2006, Dr. Schuler concluded that Tupa suffered from "a marked disc collapse . . . of approximately 90% with anterior, posterior, and lateral spurring [and] [r]etrolisthesis . . . at that level" as well as "disc space narrowing of about 30%." Dr. Schuler reported that Tupa had reached his maximum medical improvement without pursuing major spinal surgery "in the form of a stabilization and fusion of [the affected vertebrae] and that even with surgery, Tupa would not likely be able to return to the NFL. The doctor noted that they had talked about the issue extensively and that Tupa "under[stood] the risks of surgery versus no surgery, and participation and non-participation in the NFL. He agrees . . . he is not a candidate for the NFL at this time." Dr. Schuler also stated that Tupa's choice to treat the injury nonoperatively was appropriate.

An independent medical evaluation was completed by Dr. Michael Franchetti on October 12, 2006. Dr. Franchetti concurred that Tupa had reached maximum medical improvement. He concluded that "[Tupa's] back injuries sustained on August 19, 2005 are, to within a reasonable degree of medical certainty and probability, a career-ending injury for the patient." As far as permanent impairment, Dr. Franchetti found that appellee attained 33% whole person impairment,[1] of which, 28% is "directly related to his injuries of August 19,

---

1. Medical authorities evaluate "whole person impairment" or "WPI" under the American Medical Association's Guide to the Evaluation of Permanent Impairment (6th Ed.2007).

2005" and 5% could be attributed to his preexisting degenerative condition.

Another medical evaluation was completed by Dr. Charles Jackson on December 11, 2006. Pro Football submitted his report as evidence at the circuit court trial. In Dr. Jackson's opinion, Tupa could not have completed the 2005 season even without the "incident" during preseason. He concluded that the August 19 injury "manifest[s] an ongoing degenerative spine condition which shortened Tupa's career, and to a degree unknown was aggravated by years of [punting.] The kicking incident did not cause or precipitate damage to [or] materially change the degenerative condition which ended his career." Dr. Jackson also disagreed with Dr. Franchetti's assessment, finding only "10% impairment of the whole person or 24% impairment of the left lower extremity."

Tupa has continued to treat his condition non-surgically and has not returned to the NFL. He is currently employed as the Recreation Director for Bucksville, Ohio, a sedentary position that he has held since February of 2006. Pro Football paid Tupa the rest of his contracted salary for the 2005–2006 season, which ended in February 2006. He testified in the circuit court that he has to take pain medication in order to sleep through the night; otherwise, the pain wakes him up whenever he rolls over. Tupa continues exercising in a swimming pool a few times a week. He testified that he will eventually need back surgery, but is delaying the procedure as long as possible because he believes "the longer you wait the better the procedure gets."

We will discuss additional facts below.

## DISCUSSION

### I. Jurisdiction

■ Appellants first argue that Maryland does not have jurisdiction over the workers' compensation claim because (1) Tupa is not a "covered employee" under § 9–203(a)(1) of the Labor and Employment Article ("LE") of the Maryland Code

(1991, 2008 Repl.Vol.), and (2) his contract contains a forum selection clause which divests Maryland of jurisdiction.

At trial, there were no disputed questions of fact related to jurisdiction. The parties submitted a set of stipulated facts to the circuit judge, who determined as a matter of law that Maryland had jurisdiction over the claim. We evaluate the legal correctness of the court's conclusion under a de novo standard of review. *Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175 (2006). For the reasons stated below, we find that Maryland has jurisdiction over Tupa's workers' compensation claim.

### A. Tupa Is A Covered Employee

Under LE § 9-203, individuals are generally "covered employees" for purposes of the Workers' Compensation Act when they are working in Maryland for their employer. Employees are not covered when they are employed "wholly outside of this State." LE § 9-203(c). It is undisputed that Tupa's injury occurred while he was working at FedEx Field in Landover. He was expected to play eight regular season games and two preseason games in Maryland each year. Therefore, it clearly cannot be said that the claimant was employed to do work entirely and wholly outside of Maryland. *See McElroy Truck Lines, Inc. v. Pohopek,* 375 Md. 574, 584–85, 826 A.2d 474 (2003).

Appellants instead argue that Tupa was employed primarily in Virginia and worked in Maryland only intermittently. Where an individual works in Maryland intermittently or temporarily, the employee may be excluded from coverage under LE § 9-203(b)(1) which provides:

An individual is not a covered employee while working in this State for an employer only intermittently or temporarily if:

(i) the individual and employer make a contract of hire in another state;

(ii) neither the individual nor the employer is a resident of this State;

(iii) the employer has provided workers' compensation insurance coverage under a workers' compensation or similar law of another state to cover the individual while working in this State;

(iv) the other state recognizes the extraterritorial provisions of this title; and

(v) the other state similarly exempts covered employees and their employers from its law.

At trial, the parties stipulated the following facts with respect to jurisdiction:

Pro Football, Incorporated, is a Maryland corporation. It is engaged in the business of operating the Redskins. The Redskins are a franchise in the NFL. The Redskins' principal business is fielding a team to play in NFL games. All of the Redskins home games are played in Maryland. The Redskins employ players for the principal purpose of competing in NFL games. The incident occurred at FedEx Field in Landover, Maryland. The Redskins practice in Virginia. Practice for players is designed to prepare them to play in games.

The regular or casual/intermittent nature of an individual's employment in Maryland is a fact-dependent determination that must be made on a case-by-case basis. In *Hodgson v. Flippo Construction Co.*, 164 Md.App. 263, 883 A.2d 211 (2005),[2] we identified the following factors relevant to this determination: "where the claimant was hired, whether the employment 'arrangement contemplated a regular presence' in the particular jurisdiction, the 'nature of the employer's work,' the 'scope and purpose of the hiring,' the 'duration of the employment,' the 'consistency' of the claimant's work in the

---

**2.** *Hodgson* considered the regularity of employment for purposes of Section 9–203(a)(2), which provides that an individual is a covered employee "while working outside of this State on a casual, incidental, or occasional basis if the employer regularly employs the individual within this State." 164 Md.App. at 269, 883 A.2d 211. The same principles apply to the determination of whether an employee is employed in Maryland "only intermittently or temporarily" under Section 9–203(b).

particular jurisdiction, and representations made by the employer as to where the claimant would be working." *Id.* at 269, 883 A.2d 211. (internal citations omitted). When the employment is transient in nature, such as trucking or traveling sales, the dispositive factor is whether the employment in Maryland is regular when compared to the employment outside of Maryland. *McElroy Truck Lines*, 375 Md. at 594, 826 A.2d 474. The comparison "is between the State where the employment has been found to be regular and each of the other locations to which the employment has a relationship." *Id.*

Considering the stipulated facts, we find that Tupa's employment in Maryland was regular and not intermittent or temporary. Tupa was hired in Virginia, but the purpose of his employment was to play in professional football games at FedEx Field in Maryland and at various other stadiums around the country. We recognize that Tupa likely spends more time at the practice facility in Virginia than he spends playing in games at FedEx Field or elsewhere. As *Hodgson* suggests, however, the inquiry requires more than simply tallying up the quantity of time the employee spends in each jurisdiction. Here, it is clear that the purpose of Tupa's employment was to play in games, not to practice. All of Tupa's time in Virginia, whether practicing or attending team meetings, was geared towards improving his performance at the games. By way of contrast, a player signed to the practice squad would work entirely in Virginia because the *purpose* of a squad member's contract is to practice in Virginia.

Tupa's employment in Maryland was consistent and predictable: eight regular season and two pre-season games every year.[3] This can easily be distinguished from the case of *Moore v. Clarke*, 171 Md. 39, 54, 187 A. 887 (1936), where a professional jockey riding in a Maryland horse race was found to be a casual employee because he was hired by different

---

**3.** In the event that the Redskins had qualified for any home playoff games, Tupa would also have had to perform in those.

horse owners on a race-by-race basis, and had no obligation to ride the owner's horses in future races. *See also East v. Skelly*, 207 Md. 537, 539, 114 A.2d 822 (1955) (same result where two percent of the jockey's races were ridden for the same owner, but he was still employed on a race-by-race basis with no continuing obligation). Here, Tupa signed a contract obligating him to perform in all of the Redskins' games for four years, as long as he was physically able to do so. In sum, Tupa was regularly employed in Maryland because he had an ongoing relationship with his employer, a Maryland corporation, for the purpose of playing in football games, more of which took place in Maryland than in any other state.[4]

Because we conclude that Tupa's employment in Maryland was regular and not incidental, LE § 9–203(b)(1) does not apply. Although we need not decide whether Tupa would otherwise be excluded under Section 9–203(b)(1), we note that the statute requires that "neither the individual nor the employer [be] a resident of this State." LE § 9–203(b)(1)(ii). Pro Football is incorporated in Maryland and is therefore domiciled in this state. The corporation also conducts most of its revenue-generating activities, professional football games, in Maryland. Therefore, Pro Football is a Maryland resident and, even if we concluded that Tupa's employment in Maryland was only incidental, he would not be excluded from coverage under the Maryland Workers' Compensation Act.

## B. The Forum Selection Clause

■ Appellants also argue that, regardless of whether Tupa is covered by the Maryland Worker's Compensation Act, the forum selection clause in his contract requires him to file his claim in Virginia. Tupa's contract with Pro Football contains the following provision:

---

4. We believe that Tupa was regularly employed in Maryland and his employment was not transient in nature, like that of a truck driver or pilot. Even if his employment were transient, however, it is clear that his employment in Maryland is more regular than his work in any other jurisdiction, including Virginia. *See McElroy Truck Lines*, 375 Md. at 594, 826 A.2d 474.

JURISDICTION. The parties hereto agree that this Player Contract shall for all purposes be deemed to have been negotiated and executed in Virginia; that should any dispute, claim or cause of action (collectively "dispute") arise concerning rights or liabilities arising from the relationship between the Player and the Club, the parties hereto agree that the law governing such dispute shall be the law of the Commonwealth of Virginia, and that the exclusive jurisdiction for resolving such dispute in the case of Workers' Compensation is the Virginia Workers' Compensation Commission, and in the case of Workers' Compensation claims the Virginia Workers' Compensation Act shall govern.

The Supreme Court has observed that there is "a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (citing *The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). In *Gilman v. Wheat, First Securities, Inc.,* the Court of Appeals set forth the following guidelines for enforcement of forum selection clauses in Maryland:

(1) [A] forum-selection clause is presumptively valid and enforceable and the party resisting it has the burden of demonstrating that it is unreasonable, (2) a court may deny enforcement of such a clause upon a clear showing that, in the particular circumstance, enforcement would be unreasonable, and (3) the clause may be found to be unreasonable if (i) it was induced by fraud or overreaching, (ii) the contractually selected forum is so unfair and inconvenient as, for all practical purposes, to deprive the plaintiff of a remedy or of its day in court, or (iii) enforcement would contravene a strong public policy of the State where the action is filed.

345 Md. 361, 378, 692 A.2d 454 (1997).

Here, appellee contends that enforcement of the forum selection clause would contravene a strong public policy of

Maryland, as stated by LE § 9–104(a)(1).[5] That statute pro-
vides:

> [A] covered employee or an employer of a covered employee
> may not by agreement, rule, or regulation:
>
> (i) exempt the covered employee or the employer from a
> duty of the covered employee or the employer under this
> title; or
>
> (ii) waive a right of the covered employee or the employer
> under this title.

Any agreement that violates this provision is void. LE § 9–
104(a)(2).

In *Gilman*, the plaintiff challenged the validity of a forum
selection clause that required suits to be filed in Virginia,
where class actions were not permitted, because his economic
damages were too small for an individual action to be practica-
ble. 345 Md. at 367, 692 A.2d 454. The Court of Appeals held
that enforcement of the clause did not violate Maryland's
public policy, which permitted class actions and the aggrega-
tion of individual plaintiffs' claims in order to reach the
jurisdictional threshold of the circuit court. *Id.* at 380, 692
A.2d 454. While recognizing that Maryland's laws demon-
strated a public policy in favor of class actions, the Court
reasoned that "[t]he public policy does not extend any fur-
ther. . . . Maryland law does not mandate such actions; it does
not require that a plaintiff who *could* file such an action do so,
in lieu of pursuing an individual action[.]" *Id.*

The public policy set forth in the Workers' Compensation
Act is clearly different from that in *Gilman*—the very purpose
of Section 9–104 is to ensure that employers cannot contract
out of coverage. Moreover, as stated by Professor Larson,
"the rule in workers' compensation is dictated by the over-
riding consideration that compensation is not a private matter
to be arranged between two parties; the public has a profound
interest in the matter which cannot be altered by any individu-

---

5. Tupa does not argue that the clause was induced by fraud or over-
reaching, or that Virginia is an unfair and inconvenient forum.

al agreements." *See* 9 Larson, *Larson's Workers' Compensation* § 143.07 (2010).

Although Maryland courts have not directly ruled on the issue, several cases have suggested that parties cannot contract to avoid application of Maryland's workers' compensation law. In *McElroy*, the Court of Appeals gave little weight to the employment contract's forum selection clause in determining that the claimant was covered by the Maryland workers' compensation statute. 375 Md. at 578 n. 2, 594–95, 826 A.2d 474. Earlier, in *Kacur v. Employers Mutual Casualty Company*, the Court cited approvingly Professor Larson's statement that an " '[e]xpress agreement between employer and employee that the statute of a named state shall apply is ineffective either to enlarge the applicability of that state's statute or to diminish the applicability of the statutes of other states.' " 253 Md. 500, 509, 254 A.2d 156 (1969) (quoting 3 Larson, *Larson's Workers' Compensation,* § 87.71 (1968)). Many other states share this view.[6] *See Hartford Accident & Indem. Co. v. Welker,* 75 Ga.App. 594, 597, 44 S.E.2d 160 (1947); *Miller v. Hirschbach Motor Lines, Inc.,* 714 S.W.2d 652, 655–56 (Mo.App.1986); *Gotkin v. Weinberg,* 2 N.J. 305, 308, 66 A.2d 438 (1949); *Giltner v. Commodore Contract Carriers,* 14 Or.App. 340, 344–45, 513 P.2d 541 (1973); *Robert M. Neff v. Workmen's Comp.App. Bd.,* 155 Pa.Cmwlth. 44, 624 A.2d 727 (1993); *Jenkins v. Sal Chem. Co.,* 167 W.Va. 616, 618, 280 S.E.2d 243 (1981).[7]

We agree with the circuit court that the forum selection clause in Tupa's contract would contravene Maryland's public

---

**6.** As noted by Larson, the only exception is where a state's law specifically provides that parties can contract as to coverage. 9 Larson, *Larson's Workers' Compensation,* § 143.07 n. 1 (2010). Maryland does not have such a law.

**7.** This view is also consistent with *Alaska Packers Ass'n v. Industrial Accident Comm'n,* 294 U.S. 532, 542–43, 55 S.Ct. 518, 79 L.Ed. 1044 (1935), where the Supreme Court held that the Due Process Clause was not violated when California applied its own workers' compensation law to an employment contract executed in California, even though the employee was injured while working in Alaska and the contract specified that Alaska law would apply to such cases.

policy, as stated in LE § 9–104. *See Gilman v. Wheat, First Sec.*, 345 Md. at 378, 692 A.2d 454. Therefore, the circuit court did not err in finding that Maryland had jurisdiction over Tupa's workers' compensation claim.

## II. Whether Appellee Sustained A Compensable Accidental Injury

### A. Standard of Review

This workers' compensation case differs in some respects from a typical administrative appeal. The circuit court conducted an "essentially de novo" trial, a procedure similar to a new trial except that the decision of the Workers' Compensation Commission is admitted as evidence and treated as presumptively correct.[8] Three questions of fact were submitted to the jury: (1) whether the claimant suffered an accidental injury arising out of and in the course of employment on August 19, 2005; (2) whether the claimant's disability is causally connected to the accidental injury; and (3) for what period of time, if any, the claimant is entitled to temporary partial disability benefits. Pro Football had the burden of proving by a preponderance of the evidence that the Commission's decision on these issues was incorrect. *See Morris v. Christopher*, 255 Md. 372, 378, 258 A.2d 172 (1969); *Bd. of Education v. Spradlin*, 161 Md.App. 155, 203, 867 A.2d 370 (2005) (describing how the burden of persuasion shifts from

---

8. As this Court has previously explained, an essentially de novo trial is slightly different from a new trial:

> A trial that is essentially de novo is unlike the procedure applicable to many other administrative law bodies, where appeal to the circuit court is usually determined on the record made at the agency hearing. At trial, the parties may rely on the same or different evidence than was presented to the Commission. At the same time, the Commission's decision is not treated as if it had never occurred. 'It is, rather, the case that the presumptively correct outcome of that adjudication is admissible as an item of evidence and is the proper subject of a jury instruction.'

*Applied Indus. Techns. v. Ludemann*, 148 Md.App. 272, 282–83, 811 A.2d 845 (2002) (internal citations omitted). *See also Bd. of Education v. Spradlin*, 161 Md.App. 155, 189, 867 A.2d 370 (2005) (distinguishing an "essentially de novo" trial from a true de novo trial).

the claimant, who must prove causation at the Commission hearing, to the appellant-employer, who most prove non-causation at the circuit court level).

On appeal, we must uphold the jury's verdict on a question of fact as long as it is supported by legally sufficient evidence. *Keystone Masonry Corp. v. Hernandez*, 156 Md. App. 496, 506, 847 A.2d 493 (2004). The Court of Appeals has instructed:

> In cases of this nature, we do not weigh and evaluate the conflicting evidence to determine its comparative value, but decide only whether there is any evidence legally sufficient, or a lack of evidence where a negative finding is made, to support the finding of the trier of facts; and in making this decision, we assume the truth of all the evidence, and of all favorable inferences fairly deducible therefrom, tending to support the conclusion of the trier of facts.

*Talley v. Dept. of Correction*, 230 Md. 22, 29, 185 A.2d 352 (1962). The evidence is legally sufficient where, if believed and given maximum weight, it either directly shows or supports a rational inference of the fact to be proved. *Starke v. Starke*, 134 Md.App. 663, 679, 761 A.2d 355 (2000) (citing *Edwards v. State*, 198 Md. 132, 83 A.2d 578 (1951)). In other words, we must reverse only where the circuit court's fact-finding was clearly erroneous. *See Bd. of Education v. Spradlin*, 161 Md.App. at 225, 867 A.2d 370.

## B. Whether Appellee's Disability Is Compensable

Appellants argue that there was insufficient evidence to support the jury's finding that Tupa's injury was compensable because the injury (1) was not accidental, and (2) was not the cause of his disability. We will address each of these arguments in turn.

### 1. Accidental Injury

In *Rowe v. Baltimore Colts*, 53 Md.App. 526, 536, 454 A.2d 872 (1983), we held that a professional football player did not suffer a compensable accidental injury when the injury was caused by usual, rather than unusual, physical contact

with other players. Relying on *Rowe,* appellants contend that Tupa's injury was not accidental because "in the course of his long career in professional football[,] [appellee] must have not only *foreseen* but fully *expected* that injury would occur." Tupa argues that *Rowe* was abrogated by statutory changes and, in any event, is no longer good law after *Harris v. Board of Education of Howard County,* 375 Md. 21, 24, 825 A.2d 365 (2003), where the Court of Appeals overruled "the line of cases which injected the 'unusual activity' requirement into the definition of 'accidental injury.'" *Id.* at 24, 825 A.2d 365.

We agree with appellee that this Court's reasoning in *Rowe* is contrary to current statutory and caselaw in Maryland. In *Rowe,* the claimant was a defensive lineman for the Baltimore Colts football team. 53 Md.App. at 527, 454 A.2d 872. In the words of this Court, he "sustained a loss of the use of his right arm as a result of an accidental injury during a scrimmage." *Id.* Although the full contact scrimmage was a typical work activity, Rowe testified that a defensive lineman "very rarely" gets hit in the back. *Id.* at 529, 454 A.2d 872. The Court said that "an injury sustained by a professional football player as the result of legitimate and usual physical contact with other players, whether under actual or simulated game conditions, cannot be said to be an 'accidental injury' within the meaning of the Maryland Workers' Compensation Law." *Id.* at 536, 454 A.2d 872. An injury was accidental, according to *Rowe,* when "the occurrence was an unusual or unexpected happening in the course of employment." *Id.* at 536, 454 A.2d 872. Because Rowe was injured while engaged in usual work activity, his injury was "neither unusual nor extraordinary" and therefore it was not accidental. *Id.*

*Rowe's* definition of "accidental injury" implies that an employee is barred from receiving workers' compensation for injuries sustained during usual work activities because the employee assumes the risk of such injury. This reasoning is contrary to the very purpose of workers' compensation laws, and it is inconsistent with the majority of cases and statutes in other states. *See* 2 Larson, *Larson's Workers' Compensation*

§ 22.04 (2010) ("Injuries in [professional sports] are so routinely treated as compensable in the great majority of jurisdictions that they seldom appear in reported appellate decisions").[9] In fact, we are aware of only one other state court which has held that a professional football player cannot recover for unintended injuries suffered in the course of employment: *Palmer v. Kansas City Chiefs Football Club*, where the Court of Appeals of Missouri held that a professional football player could not recover for injury sustained during a game because "whatever strain resulted [from the play] was an expected incident of the usual work task done in the usual way." 621 S.W.2d 350, 356 (Mo.Ct.App.1981). *Palmer* was pilloried by Professor Larson:

> This decision is wrong. Just how conspicuously wrong can quickly be demonstrated by a check-list of four respects in which its wrongness makes it unique in the history of workers' compensation. (1) It is the only surviving appellate decision denying compensation for injury in a professional team sport. (2) It is the only case in history in which a class of employees has been told, first, that they are covered by the compensation act but, second, they are not protected when doing the very job they were hired to do. (3) It is the only case in compensation history in which unintended traumatic injuries have been held non-accidental. (4) It is the only category of employees as to whom the doctrine of assumption of risk has been reintroduced by the court, after having been deliberately ruled out by the legislature.

---

**9.** The following cases, among others, hold that professional athletes are eligible for workers' compensation: *Pro–Football, Inc. v. D.C. Dept. Of Employment Servs.*, 588 A.2d 275 (D.C.Ct.App.1991); *Knelson v. Meadowlanders, Inc.*, 11 Kan.App.2d 696, 732 P.2d 808 (1987); *Boden v. Detroit Lions, Inc.*, 193 Mich.App. 203, 483 N.W.2d 673 (1992); *Brinkman v. Buffalo Bills Football Club*, 433 F.Supp. 699 (W.D.N.Y.1977); and *Pittsburgh Steelers Sports, Inc. v. Workmen's Comp.App. Bd.*, 145 Pa. Comwlth. 547, 604 A.2d 319 (1992). At least one state specifically excludes professional athletes by statute. *See, e.g.,* Fl. Stat. § 440.02(17)(a) (2010).

2 Larson, *Larson's Workers' Compensation* § 22.04 (2010).[10] Larson cites *Rowe* only for the proposition that it was abrogated by statute. *See id.* at § 22.04, fn 10.

Since 1982, the Workers' Compensation Act has specifically provided that "compensation may not be denied to an employee because of the degree of risk associated with the employment." Chapter 801, *Laws of 1982;* Chapter 8, *Laws of 1991* (now codified as LE § 9–507). The *Rowe* Court took note of the then-new statute, but declined to follow it, presumably because it was not in effect when Rowe's claim was filed.[11] In any event, the statute clearly precludes any further application of the *Rowe* reasoning to prohibit a professional football player from recovering workers' compensation simply because, in the words of the appellants, he "is engaged in an occupation that by its very nature renders injury commonplace."

Further, the Court of Appeals has definitively rejected the "usual activity" test on which *Rowe* was based. In *Harris v. Board of Education, supra,* the Court of Appeals considered the case of a high school cafeteria worker who injured her back while dragging a heavy box of laundry soap. 375 Md. at 26, 825 A.2d 365. Bending and lifting heavy objects was a requirement of her job, and she typically did the laundry at the end of every day. *Id.* at 26, 825 A.2d 365. The jury found that her injury was not "accidental" because it resulted from usual work activities. *Id.* at 27, 825 A.2d 365. This Court affirmed in an unreported opinion, relying on a string of Court of Appeals cases which held that an injury sustained during the course of employment was only compensable if it resulted

---

**10.** Both *Rowe* and *Palmer* were criticized and rejected by the Court of Appeals of Virginia in *Pro–Football, Inc. v. Uhlenhake,* 37 Va.App. 407, 414–15, 558 S.E.2d 571 (2002).

**11.** The legislative history of S.B. 645 reveals that the legislators had professional athletes in mind and at least some of the legislators viewed this amendment as a clarification of existing law, rather than a change. *See Testimony Summary of Charles Krysiak on S.B. 645* (1982) (stating that professional athletes are already covered by the Workers' Compensation Act, but the amendment would "send a message to the Commission").

from an "unusual exertion or unexpected movement," or if there was an "extraordinary or unusual condition or happening in the operations of the employer." *Stancliff v. H.B. Davis Co.*, 208 Md. 191, 203, 117 A.2d 577 (1955). *See Harris*, 375 Md. at 27, 825 A.2d 365 (citing *Sargent v. Bd. of Ed., Balt. Cnty.*, 49 Md.App. 577, 580–81, 433 A.2d 1209 (1981)).

The Court of Appeals held that the "unusual activity" line of cases violated the basic principle of statutory interpretation that "the Court will 'neither add nor delete words in order to give the statute a meaning not otherwise communicated by the language used.' " *Harris*, 375 Md. at 31, 825 A.2d 365 (quoting *Blind Indus. & Servs. of Md. v. Md. Dep't of Gen. Servs.*, 371 Md. 221, 231, 808 A.2d 782 (2002)). Under the plain language of the statute, the Court observed, "what must be 'accidental' is the *injury* and not the activity giving rise to the injury." The *Harris* Court also relied on the leading Maryland workers' compensation case, *Victory Sparkler & Specialty Co. v. Francks*, 147 Md. 368, 128 A. 635 (1925), which described the purpose of the Workers' Compensation statute as follows:

> The statutory definition of injury, which was made compensable without reference to neglect of employer or fault of worker, except when the injury was self-inflicted or the sole result of the intoxication of the employee, *and the abolition of the fellow-servant rule, of the defences of contributory negligence and assumption of risk,* and the substitution of a regulated and certain compensation for damages, contribute convincingly to the conclusion that *the legislative intent was to include within the act not only the newly created class of compensable injuries, but also every injury which could be suffered by any worker in the course and arising out of the employment, for which there was then a subsisting right of action.* With this conception of the purpose and effect of the act, the Legislature was consistent in making the prescribed liability of the employer and remedy of the employee *exclusive with respect to all injuries sustained in the hazardous employment.*

147 Md. at 377, 128 A. 635 (emphasis added) (internal citations omitted).

The "unusual activity" test is also contrary to the often-cited principle that "the Workers' Compensation Act . . . should be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes. Any uncertainty in the law should be resolved in favor of the claimant." *Mayor & City Council of Baltimore v. Cassidy*, 338 Md. 88, 97, 656 A.2d 757 (1995).

With this in mind,[12] the *Harris* Court returned to *Victory Sparkler*'s definition of an "accidental injury" as one that happened "by chance or without design, taking place unexpectedly or unintentionally." *Victory Sparkler*, 147 Md. at. 374, 128 A. 635. Applying this test to the cafeteria worker's injuries, the Court found that her injuries were accidental because they "occurred by chance and were completely unexpected and unintentional." *Harris*, 375 Md. at 37, 825 A.2d 365. The Court expressly overruled *Slacum v. Jolley, Miskowiak v. Bethlehem Steel Co., Atlantic Coast Shipping Co. v. Stasiak*, and all other "similar holdings." *Id.* at 59, 825 A.2d 365; *Slacum*, 153 Md. 343, 352, 138 A. 244 (1927) (denying workers' compensation because there was no evidence that the injury was caused by "anything of extraordinary or unusual character"); *Miskowiak*, 156 Md. 690, 697, 145 A. 199 (1929) (same); *Atlantic Coast Shipping*, 158 Md. 349, 351, 148 A. 452 (1930) (same). It is clear that *Rowe* is one such similar holding that was overruled by *Harris*.

Applying the *Victory Sparkler* definition of "accidental injury," we find that the evidence was more than sufficient to support the jury's finding that Tupa suffered an accidental injury. The jury heard evidence that Tupa hurt his back when he landed awkwardly while punting in warm-ups for a preseason game. There is no allegation that the injury was intentional. Medical testimony supported the conclusion that Tupa suffered a sudden, traumatic injury: he immediately

---

12. The *Harris* Court was also troubled by the inconsistency in its own cases, identifying "four different lines of Maryland Court of Appeals cases concerning [the unusual activity requirement], each line conflicting with the others." 375 Md. 21, 50–51, 825 A.2d 365.

sought medical attention, received steroid treatments, and did not play in the game for which he had been warming up. Two days later, he reported 95% back pain with numbness and tingling in his left foot. Prior to that preseason game, he had only intermittent symptoms of his underlying chronic disc degeneration. This evidence is sufficient to support the jury's finding that Tupa suffered an "accidental injury."

Appellants rely primarily on the argument that the injury was foreseeable and expected because of the nature of Tupa's employment as a football player. However, the jury heard evidence that Tupa was cleared to play by the Redskins' own doctors, which suggests that it was not expected and foreseeable that routine punting action would cause a career-ending injury. The doctor who performed Tupa's end of the season physical in January 2005 stated that his chronic degenerative disc disease would not prevent him from playing at least one more season in the NFL, although it would require intervention sometime in the future. We have found nothing in the record suggesting that Tupa's career-ending injury was so certain to occur that the jury could have deemed it intentional rather than accidental. Rather, it is clear that the injury was both sudden and unexpected, although Tupa was engaged in a usual activity at the time of the injury.

■ Moreover, appellants' argument seeks to reintroduce the "assumption of the risk" defense for hazardous employment, which was abolished by the Workers' Compensation Act and rejected again by *Harris*. Even if we found this line of reasoning persuasive, we would be precluded from following it by the plain language of LE § 9–507: "Compensation may not be denied to a covered employee because of the degree of risk associated with the employment of the covered employee." Neither mine workers nor members of the militia are excluded from receiving compensation for work-related injuries due to the risk inherent in their employment. *See Merrill v. State Military Dep't*, 152 Md. 474, 136 A. 897 (1927) (granting workers' compensation to member of National Guard); *Ste-*

*venson v. Hill,* 171 Md. 572, 189 A. 910 (1937) (same for mine workers). Nor is there an exception for professional football players.

## 2. Causal Relationship Between Injury and Disability

 Finally, appellants challenge the jury's finding that Tupa's disability was caused by an accident suffered in the course of his employment and not his chronic disk degeneration. Before the Commission, the claimant has the burden of showing that the disability claimed is causally related to the accidental injury. *Reeves Motor Co. v. Reeves,* 204 Md. 576, 582, 105 A.2d 236 (1954). At the circuit court trial, the Commission's decision is presumed correct and the employer-appellant has the burden of proving by a preponderance of the evidence that the disability is not causally related to the injury. *Bd. of Education v. Spradlin,* 161 Md.App. 155, 203, 867 A.2d 370 (2005). Once it is established that the injury was a cause of the disability, temporary disability benefits are awarded without regard to the existence of a pre-existing condition. *See Martin v. Allegany Cnty. Bd. Of Cnty. Comm'rs,* 73 Md.App. 695, 700, 536 A.2d 132 (1988) ("That benefits are to be awarded for a temporary disability without regard to pre-existing disease or infirmity makes clear that it is the final accident contributing to the disability which is to serve as the basis for liability").

In this case, there is ample evidence to support the jury's finding that the injury was causally related to the accident. Tupa was examined by team physicians prior to the 2005–2006 season. Although the doctor noted chronic degenerative disc disease, Tupa had played the entire 2004–2005 season with the same underlying chronic condition and had performed satisfactorily. He was not in constant pain and the team physician expected him to be able to play for at least one more season, possibly two, in his condition. After the August 19, 2005 injury, Tupa reported constant and severe pain. He testified that he had difficulty performing his regular daily activities and even sleeping without disruption due to the pain. It is undisputed that he is physically unable to punt in the NFL.

Although Tupa's chronic condition would have continued to deteriorate absent the August 19 injury, the jury needed only to find that the accidental injury contributed to the disability, not that it was the sole cause. *See Martin*, 73 Md.App. at 700, 536 A.2d 132. The evidence was more than sufficient to support this finding.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

